Margaret M. HUTTIG and Charles M. Huttig, Jr., Trustees Under the Will of Charles M. Huttig, Deceased, Appellants,

v.

CITY OF RICHMOND HEIGHTS, Missouri, Lee M. Duggan, Mayor of the City of Richmond Heights, Missouri, and Nelson L. Clark, Lester Watson and Clyde C. Espenschied, Councilmen of the City of Richmond Heights, Missouri, Respondents,

and

Dr. Stanley Hampton, Zola Carp and Murray Steinberg, Trustees of Lake Forest Subdivision, Respondents.

No. 49485.

Supreme Court of Missouri,

Division No. 2.

Nov. 11, 1963.

Motion for Rehearing or to Transfer to Court En Banc Denied Dec. 9, 1963.

**834**

Rassieur, Long & Yawitz, Elliott P. Koenig, and Allen A. Yoder, St. Louis, for (plaintiffs) appellants.

Louis A. Robertson, St. Louis, for respondents.

Murray Steinberg, St. Louis, for intervenors-respondents.

EAGER, Judge.

This is a declaratory judgment suit in which plaintiffs, as owners of a tract in Richmond Heights, sought to have the Court declare the City's general zoning ordinance No. 1685 invalid as to their tract because it was allegedly unreasonable, arbitrary and confiscatory as so applied. The trial court decided for the defendants; the individual defendants are city officials. The three last named respondents who intervened and later became defendants, are Trustees of an adjoining residential subdivision. Plaintiffs have raised various constitutional questions; these contentions, in all probability, do not involve *constructions* of our own or of the Federal Constitution, but merely require *applications* of the constitutional provisions in question to the zoning ordinance under the particular facts. Wrigley Properties, Inc. v. City of Ladue, Mo., 369 S.W. 2d 397. However, we do have jurisdiction because of the amount in dispute, as shown by substantial evidence.

Plaintiffs are the owners of the strip of land in question which lies along the south side of Clayton Road in Richmond Heights; it is presently zoned for Class "A," single family residences, and plaintiffs have sought a "G" commercial zoning; its east end is approximately 200 feet from the southwest corner (rounded) of the intersection of Clayton Road with Hanley Road. This tract is 532.33 feet long on its Clayton Road frontage, 414.64 feet long in the rear, and 130.06 feet deep; its easterly line extends 177.75 feet at an acute angle from its longer frontage on Clayton to the east end of its shorter rear line. The tract is vacant except for trees and shrubs. There is a stone wall perhaps 3 or 4 feet high along its front property line. This tract abuts the rear of Lots 1, 2, 3, 4, 5 and 6 in Lake Forest, a residential subdivision, upon which lots four rather large residences have stood for a considerable time. From the east end of plaintiffs' property a strip of land 20 feet wide extends along Clayton Road east to its intersection with Hanley Road; this was originally a part of Lot 1, Lake Forest; it was conveyed by the Trustees to Charles M. Huttig in 1939, and it is not involved in the present application for a rezoning. It lies between the remainder of Lot 1 and Clayton Road, and is wholly unoccupied.

The subdivision described as Lake Forest was platted and established by Lake Forest Development Corporation in 1929; sundry restrictions, conditions and reservations were imposed in a conveyance to Trustees

on December 31, 1930. The subdivision extends approximately six blocks south of Clayton Road, and contains private roadways; it is bounded by Hanley Road on the east and by the east line of Lavinia Terrace, another subdivision, on the west. The tract now in controversy was not included in the subdivision but was reserved conditionally as a park for the use of the lot owners. As such, it was conveyed to the Trustees of the subdivision (on December 31, 1930) with the duty imposed to maintain it, and with the right to assess the lot owners therefor, but with the further provision that the conveyance, as such, would not be effective until the owners of 117 lots (out of a total of 124) had accepted and agreed to the provisions; also, with the further provision that the Trustees might abandon the park project and convey that property by quit-claim deed to the grantor or its successors or assigns. The requisite number of lot owners never accepted the conditions, and apparently none of the individual owners contributed to the maintenance of the park; in 1936 the Trustees conveyed this tract to Charles M. Huttig (recognized in this litigation as the successor or assign of the original grantor) upon condition that he maintain the park until December 31, 1955, when all rights of the original grantor and of the lot owners therein should cease, and title should vest in such grantee. On April 30, 1937, this was confirmed by a quit-claim deed to Huttig as the successor of the Lake Forest Development Corporation. Huttig took possession, paid the taxes and maintained the park until his death in 1952, after which his representatives (these plaintiffs) did so until the end of 1955. These plaintiffs have since claimed full ownership and no one disputes their title in the present case.

The City of Richmond Heights lies immediately west of and adjacent to the City of St. Louis; its population is about 17,500. It is bounded on the north by Clayton, on the south by Brentwood and Maplewood, and on the west by Ladue. Its main east and west traffic arteries are Clayton Road and the Daniel Boone Expressway. Its chief north and south arteries are Big Bend, Hanley Road and Brentwood. The northern boundary of Richmond Heights is the center of Clayton Road.

The intersection of Hanley Road (north and south) with Clayton Road (east and west) is rather intricate; a drive from Lake Forest comes in from the southwest and Hampton Drive from the southeast; Hanley itself jogs to the west before proceeding further north. Bettendorf's, a large supermarket, lies just across Clayton Road to the north, in the path of what would normally be Hanley Road, extended. Traffic from at least one parking lot driveway of Bettendorf's spills out into the intersection; traffic from another comes out a little further east along Clayton. North of Clayton Road another drive (Biltmore) comes into Hanley and Clayton from the northwest. As one witness said, the traffic signals at the intersection have "about seven" faces. Nevertheless, both Clayton and Richmond Heights permit left turns on light signal at the intersection and apparently more or less indiscriminately east and west of it.

To the east of Hanley on the south side of Clayton are single-family residences for some distance; beyond that are single residences mixed with duplexes; finally, there is a small commercial area as one approachess Big Bend Boulevard; all these areas are in Richmond Heights. On the north side, in Clayton, lies Bettendorf's with parking facilities for hundreds of cars; from that point on east there is an interspersing of large apartment buildings and residences to a point just west of Big Bend. The rear exposures of some of these apartments face Clayton Road.

To the west of the subject property (in Richmond Heights and along the south side of Clayton) and beginning immediately beside it there are, respectively: a restaurant (The Pancake House, built in 1934), a combination office building (Gulf Oil) and filling station, a vacant filling station, an occupied filling station, a Howard Johnson restaurant, a filling station, another office

building and filling station (DX), a catering company, a restaurant, a florist shop, a drive-in restaurant, a filling station and another filling station. Some of these were built before 1941, some since. These uses extend to Brentwood Boulevard, where in and around the southwest corner (occupied by a filling station) is a very extensive shopping center called Westroads, which, with its parking lots for 2,500 cars, covers approximately a three-block area. This area was recently rezoned to a "G–1" commercial use. A part of that land had previously been zoned as residential and three houses were moved away Another area of approximately 50 acres between plaintiffs' tract and Brentwood Boulevard has also been zoned "G–1" and on this is located (somewhat back to the south of Clayton Road) a combination 48-lane bowling alley, restaurant and cocktail lounge. Around the corner of Clayton and Brentwood there is an intensive and large commercial development; the commercial zoning also runs to the south along Brentwood, as well as north and west from the intersection in the City of Clayton. Looking back now to the intersection of Clayton and Hanley, there is a continuous commercial development extending west all the way along the north side of Clayton Road (in Clayton) to Brentwood Boulevard. In this line there is only one vacant lot, which, of course, is zoned commercial. These buildings include a rather substantial insurance office building, miscellaneous stores (with an occasional vacancy), a bakery, a drugstore, small office buildings, a florist shop, gasoline stations, and west of Brentwood a bowling alley and stores. Many of these structures were there prior to 1941; others have been erected since.

The Pancake House (immediately west of plaintiffs' property) and the two filling stations just west of it, were built prior to the 1941 general zoning ordinance and those tracts have long been zoned as "G" commercial; however, the commercial zoning along Clayton stops at plaintiffs' west property line. The 265–foot strip immediately

west of plaintiffs' tract had also been owned by Lake Forest Development Corporation but was deeded to Audrey Realty Company in 1936; it (like plaintiffs' present tract) had not been included in the Lake Forest subdivision.

Clayton Road carries much through traffic, to and from St. Louis. The traffic count on Clayton Road at Hanley in April 1960 was 20,600 cars for 24 hours; at Brentwood Boulevard it was 22,200; on Hanley Road, south of Clayton, the count was 7,300; north of Clayton, it was 20,100. The speed limit in Clayton is 35 miles per hour; there are two traffic lanes and a parking lane on each half of Clayton Road; its total width is 56 feet. Parking meters have been installed on both sides of Clayton Road from Hanley Road west, with two-hour limits in Richmond Heights (south side) and with parking prohibited from 7:00 a. m. to 9:30 a. m. No parking is permitted for 900 feet east of Hanley on the south side of Clayton Road, and there are no parking meters on that side all the way to Big Bend.

As might be expected, the expert testimony concerning the "highest and best use" and zoning of plaintiffs' property was conflicting. Considerable has been said as to the respective qualifications of these witnesses, but we shall not go into that. All were well qualified and substantially all had made studies of the property and the neighborhood. For plaintiffs, that testimony was, in substance, as follows: that the highest and best use of a given tract is the one which is productive of the most value to the owner, the neighborhood and the community; that such use for this property would consist of office and store buildings or of single occupancy type office buildings, which would require a commercial "G" zoning; that such opinion considers the character of the neighborhood, the adjoining uses, the traffic, the parking and the building codes, as well as other factors; that under the present zoning classification four residences (and only four), each with a 15,000 (or greater) square foot area could

be constructed; that the setback from Clayton Road could only be 30–40 feet; that zoning questions are "regional," and that the nature of the property across Clayton Road must be considered, as well as the traffic, the parking meters and the business area immediately to the west; that traffic often backs up in front of this property from the Hanley Road intersection; that stores and offices would not be detrimental to the residences in Lake Forest or any others in the neighborhood, and that such use would not open up other property to commercial development; that Hanley Road and the vacant 20 x 200 foot strip east of this tract would act as good "buffers"; that the present zoning forces an uneconomic use, and is inconsistent with the uses of the neighboring properties; that for residence purposes lots on this tract would have to be sold individually, since in all probability, no "speculative" financing could be obtained because the desirability of the location for residences was questionable; that such sales would take a long time; that actually all of Clayton Road from Hanley to Brentwood is a sort of "Community Center"; that any added traffic congestion which might be caused by the commercial use of this tract would be entirely insignificant when compared to the existing traffic volume and congestion; that parking meters constitute and represent a commercial use; that only four of the homes in Lake Forest abut this tract (being south and east of it) and that the rear of the closest one is probably 125 feet distant, with trees and shrubs between; that the value of this tract had been investigated but that there were few comparable properties; that its value, as now zoned, is about $30,000; that it would be worth $165,550 if zoned commercial, or $350 per front foot; that the residences to the rear of the commercial property on the north side of Clayton (separated by a service alley and with the rear of the lots of the first row of houses on the alley) have not suffered from the commercial development; that some extreme uses of plaintiffs' tract could affect the adjoining homes; that the Richmond Heights zoning should be reappraised generally, recognizing the trend in Clayton for the past 20 years; that any new houses built on the south side of Clayton Road east of Hanley in the past few years (apparently very few) were built opposite residential property, not commercial; that there is probably an adequate amount of commercial zoning in Richmond Heights if it were all properly located, but that it is not.

The expert testimony for defendants was, in substance: that there would be a definite "market" for four residences erected on this tract, and that the nearby commercial area should have no "bearing" on this; that this land should be worth $53,200 for residential purposes, thus fixing the value of each lot at about $13,200; that the value of the tract as commercial property would be no higher than that as residential considering its depth, although the tract *could* be developed commercially; that it is difficult to sell residential properties abutting commercial property because people do not want them, and that any commercial development here would depreciate the residence values in Lake Forest; that the abutting houses there are worth from $60,000 to $80,000; that Clayton Road at that point is a "good residential street"; that this property is worth $100 a foot (or approximately $53,200) zoned either for residences or commercial; that the operation of the Pancake House now affects the houses on Lots 8 and 9 in Lake Forest; that the present zoning is reasonable and that the Lake Forest subdivision "needs to be protected"; that perhaps 25% to 30% of the property now commercially zoned in Richmond Heights is either vacant or is not being used as such, though much is now being used for residences; a large part of this is east and south of the present tract, along Big Bend and south of Dale Avenue; that commercial "strip zoning" is no longer considered good zoning, and that it creates traffic problems; that a commercial use of this property would aggravate the traffic problems by causing more left turns into and out of the property; that the traffic on Clayton Road

has not decreased appreciably since the opening of the Daniel Boone Expressway; that there would be a tendency for the commercial development to creep on eastward if this tract were rezoned; and that (referring to this tract): *"Perhaps the best use would be to leave it vacant,"* one reason being to conserve Lake Forest and another, that "vacant land, from a tax base and from a service and income point of view, often is the best and highest use of a community"; and further, that the next best use would be residential; that a commercial development would require more municipal services; that this tract is located in an area bounded by streets, a railroad right of way and a parkway which boundaries make it an area suited for good residential zoning, except for the three commercial uses immediately west of plaintiffs' tract; that parking meters do not affect the residential character of this property, though the witnesses could recall no similar situation elsewhere; that some commercial uses permitted in a "G" district would naturally be much more objectionable than others.

Two owners of abutting homes in Lake Forest testified; one, living on the northeast corner tract (parts of two lots), said that he had screened his lot with shrubs and trees along Clayton Road to avoid "some of the noises from traffic," and that any of various suggested commercial developments on the Huttig tract (varying from a filling station or animal hospital or garage to a single purpose office building for professional people) would depreciate the value of his property. His tract abuts the plaintiffs' tract only along the latter's east end. Another home owner, whose property lay just southeast of the Pancake House and south of the west part of plaintiffs' tract, told of the noise and lights from that establishment and also expressed the view that any of the suggested commercial uses of the Huttig tract would be detrimental to his property; also, that his house was about 150 feet from the existing restaurant, but that the res-

taurant was located there when he bought his place in 1956.

It was stipulated that the City Council denied the rezoning application for the reasons given by the Zoning Commission, namely: that such rezoning would violate the comprehensive zoning plan, increase traffic congestion, result in a detriment to *adjacent* residential property, and be injurious to the general welfare. No point is made that the application was not regularly made or that plaintiffs have not thus exhausted their administrative remedies.

■ The principles fixing the validity or invalidity of zoning ordinances have often been stated; it is the application of these principles to a given state of facts which creates the difficulty. The authority of the defendant city to zone arises solely from the enabling provisions of Ch. 89, RSMo 1959, V.A.M.S.,[1] and its predecessor statutes. City of Moline Acres v. Heidbreder, Mo., 367 S.W.2d 568; State ex rel. Kramer v. Schwartz, 336 Mo. 932, 82 S.W.2d 63; Downing v. City of Joplin, Mo., 312 S.W.2d 81. For convenience, we quote § 7412, RSMo 1939, since plaintiffs insist that the present zoning does not come within its purposes and intent. It is as follows: "For the purpose of promoting health, safety, morals, or the general welfare of the community, the legislative body of all incorporated cities, towns and villages is hereby empowered to regulate and restrict the height, number of stores, and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts, and other open spaces, the density of population, and the location and use of buildings, structures and land for trade, industry, residence or other purposes."

■ A zoning ordinance may be valid generally, yet invalid in its application to a specific tract. Flora Realty & Investment Co. v. City of Ladue, Banc, 362 Mo. 1025, 246 S.W.2d 771; Women's Kansas City St. Andrew Society v. Kansas City (8 Cir.), 58

---

1. All statutory citations will be to this revision unless otherwise stated.

F.2d 593, 599. The applicable rules are well stated in Flora, supra, where the Court said in part, at loc. cit. 777 et seq.: "'* * * Unless it should appear that the conclusion of the city's legislative body in the respect in issue here is clearly arbitrary and unreasonable, we cannot substitute our opinion for that of the city's Board of Aldermen in zoning the property in question, and establishing the boundary lines. If the city's action in zoning the property is reasonably doubtful or even fairly debatable we cannot do so.' * * * It is well settled, however, that 'The governmental power to interfere by zoning regulations with the general rights of the land owner by restricting the character of his use, is not unlimited, and, other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare.' * * * 'A zoning ordinance may be valid in its general aspects, and yet as to a particular state of facts involving a particular owner affected thereby may be as to such owner so clearly arbitrary and unreasonable as to be unenforceable.' Women's Kansas City St. Andrew Soc. v. Kansas City, Mo., supra [58 F.2d 599.] * * * 'What may be the most appropriate use of any particular property depends not only on all the conditions, physical, economic and social, prevailing within the municipality and its needs, present and reasonably prospective, but also on the nature of the entire region in which the municipality is located and the use to which the land in that region has been or may be put most advantageously.' * * * The zoning ordinance in question having been enacted by the legislative body of the city pursuant to the police power is presumed to be valid. * * * The fact that loss will be sustained through depreciation, if the ordinance is valid, is not controlling. Every valid exercise of the police power is apt to affect the property of some one adversely." And see, generally, to the same effect: Deacon v. City of Ladue, Mo.App., 294 S.W.2d 616; City of Richmond Heights v. Richmond Heights Memorial Post Benevo-lent Ass'n, 358 Mo. 70, 213 S.W.2d 479; Landau v. Levin, 358 Mo. 77, 213 S.W.2d 483; Downing v. City of Joplin, Mo., 312 S.W.2d 81.

Counsel on both sides have cited and discussed many outstate cases; plaintiffs' counsel, especially, cite numerous Illinois cases which they believe to be applicable, as do defendants' counsel to a lesser extent. The Illinois courts seem to have been rather liberal in overturning zoning ordinances when considering their applicability to particular properties in the metropolitan districts. We are interested in these outside cases only to the extent that they may (and do in some instances) logically apply rules similar to ours to given and similar factual situations. Actually, the rules announced by the Illinois Courts are almost identical to ours.

The trial court here made no detailed findings of fact; it found certain formal matters, found generally "in favor of the defendants and against the plaintiffs," found that plaintiffs' evidence was insufficient to prove the ordinance unreasonable, and found that, to grant plaintiffs' prayer would permit some uses which would be clearly undesirable for other property in the area. Although stated as findings, some of its statements as to the validity of the ordinance were actually conclusions of law. We necessarily make our own findings here and arrive at our own conclusions, allowing due deference to the views of the trial court on the credibility of witnesses. Section 510.310. In this case the matter of credibility, as such, occupies a very narrow field; the questions are rather those of judgment, and the logic (or lack of it) in expert opinions.

There can be little controversy here about many essential facts. Clayton Road to the west of this property is entirely commercial to a point beyond Brentwood Boulevard; Clayton Road across the street is entirely commercial for at least the same distance west, and for a block or more (Bettendorf's) to the east of Hanley Road. The

traffic on Clayton Road (over 20,000 cars in a 24-hour period) is such as to make it one of the busiest arteries in the county. Parking meters have been placed in front of plaintiffs' property for the benefit of Richmond Heights and, indirectly, for the benefit of the merchants across the street in Clayton; Richmond Heights has elected *not* to enforce no parking restrictions there except from 7:00 a. m. to 9:30 a. m. The value of plaintiffs' property zoned for residences was variously stated to be from $30,000 to $53,200; as commercial property it was valued by plaintiffs' witnesses at $165,550, although one of defendants' witnesses stated, with little apparent logic and a doubtful explanation, that it was worth no more as commercial property than as residential. The depth of 130 feet, while perhaps not most desirable, was admittedly sufficient to permit a limited commercial development, with sufficient off-street parking to comply with the city ordinances; the size of any building or buildings would need to be adjusted accordingly. The residential area in Clayton (Davis Place) north of the commercial development on the north side of Clayton Road, has not been greatly affected by that commercial development; at least such was indicated by the actual sales; those houses are of a more modest type and cost than the ones along the north side of Lake Forest. The City of Richmond Heights has rezoned two large areas along the south side of Clayton Road (some of this being previously residential) as G-1 or retail business, and it has also rezoned to commercial use properties in other locations which are probably too far away to have any direct bearing on our problem.

We find here, as part of our factual conclusions, that any added traffic congestion which would be caused by any ordinary commercial use of this tract would be wholly insignificant, when compared to the existing volume of traffic and congestion; we note also that the correction really needed at the intersection of Hanley Road and Clayton Road involves matters of highway engineering and reconstruction, and that it goes much deeper than a mere continuation of the residential zoning of this minor tract; thus the tract should not be penalized because of existing traffic conditions. Indeed, as indicated in Tews v. Woolhiser, 352 Ill. 212, 185 N.E. 827, congested traffic conditions " * * * scarcely constitute an argument in support of the limitation of block A to residence use, since such conditions rather argue its unfitness for such use." And in The Exchange National Bank of Chicago v. The County of Cook, 6 Ill.2d 419, 129 N.E.2d 1, the Court said, loc. cit. 4-5: " * * * whether the daily flow of vehicles on Cicero Avenue is 29,000 or 50,000 the increase in traffic which will be caused by the operation of the proposed truck terminal on plaintiffs' property would be so insignificant and minimal as to bear little relation to the public safety. On the other hand, if the residential classification is enforced, the damage to the plaintiffs is considerable and the effect is confiscatory." See also Dalkoff v. City of Rock Island, 17 Ill.2d 342, 161 N.E.2d 292; In Re Northeast Corner of E. Center Street & Chicago Avenue, Ohio Com.Pl., 186 N.E.2d 515. It is a fair inference from the record that most of the volume of traffic at this location is through traffic, not originating in the neighborhood; and that such congestion as may be caused by local conditions arises largely by reason of permitted left turns.

We find that the value of this tract as residential property is not more than one-third of its value as commercial property. While this question is by no means decisive, Flora Realty & Investment Co. v. City of Ladue, Banc, 362 Mo. 1025, 246 S.W.2d 771; Wrigley Properties, Inc. v. City of Ladue, Mo., 369 S.W.2d 397, it is certainly an element to be considered, particularly in ascertaining the relationship of the zoning to the public welfare. The People ex rel. R. Larsen and Company, Inc. v. City of Chicago, 24 Ill.2d 15, 179 N.E.2d 676, 678. Also, considering the regional development as well as the immediately adjoining property to the west in Richmond Heights, we find that the nature of this tract is basically

commercial. The facts have been fully developed and we need not repeat them. The ownership and control of the tract is not now in any way connected with Lake Forest. The lot owners there had an opportunity over the years to join in on a park project and to help maintain it by their approval of assessments, but they failed to do so. They are hardly entitled to a free park now, which is precisely what a continuation of the existing vacancy would amount to. We find also that under existing conditions this tract is not reasonably suitable for or adapted to the type of residential development for which it is zoned (15,000 square feet per residence), if indeed it is suitable for *any* residential development. The front of any residence here would be located only 30 to 40 feet from the edge of Clayton Road; there are parking meters in front of the entire tract; any residence erected on the west end would be separated only by a matter of feet from the existing Pancake House, with its lights, parking, and late closing hours. Defendants' own experts testified, indirectly, that such a residence would be undesirable. We are convinced that there would be no real market for homes on this tract, especially with the lots valued at $13,200 each, according to defendants' expert. It is obvious that only an unusual type of person would pay a proportionate price for a residence under these circumstances and at that location.

In Dowsey v. Village of Kensington, 257 N.Y. 221, 177 N.E. 427, 86 A.L.R. 642, the village had zoned as residential a strip at one end which bordered on a very busy highway; and this, notwithstanding the fact that on both sides of the tract there was almost continuous commercial development in the region generally. The Court of Appeals held the zoning invalid, and said in part, 177 N.E. at 430: "The inference is reasonable that the property fronting on Middle Neck road has been included in the residence district primarily for the purpose of providing a beautiful and dignified village frontage on the public thoroughfare. * *

"Certainly an ordinance is unreasonable which restricts property upon the boundary of the village to a use for which the property is not adapted, and thereby destroys the greater part of its value in order that the beauty of the village as a whole may be enhanced. In such case the owner of the property cannot be required to ask as a special privilege for a variation of the restriction. The restriction itself constitutes an invasion of his property rights." To the effect that property may not be so zoned as to prevent any effective use, and that such a zoning is unreasonable and arbitrary, see, generally: McQuillan Municipal Corporations, 3rd Rev.Ed., Vol. 8, § 25.45, pp. 104, 105; Tews v. Woolhiser, 352 Ill. 212, 185 N.E. 827; Dalkoff v. City of Rock Island, 17 Ill.2d 342, 161 N.E.2d 292; The Exchange National Bank of Chicago v. County of Cook, 6 Ill.2d 419, 129 N.E.2d 1; Illinois National Bank & Trust Co. v. County of Winnebago, 19 Ill.2d 487, 167 N.E.2d 401; Arverne Bay Const. Co. v. Thatcher, 278 N.Y. 222, 15 N.E.2d 587, 117 A.L.R. 1110. In the last case cited, the Court said at 15 N.E.2d 592: "An ordinance which *permanently* so restricts the use of property that it cannot be used for any reasonable purpose goes, it is plain, beyond regulation, and must be recognized as a taking of the property. * * * During the nine years from 1928 to 1936, when concededly the property was unsuitable for any conforming use, the property was assessed at $18,000, and taxes amounting to $4,566 were levied upon it, in addition to assessments of several thousand dollars; yet, so far as appears, the district was no better suited for residence purposes at the time of the trial in 1936 than it was when the zoning ordinance was amended in 1928. In such case the ordinance is clearly more than a temporary and reasonable restriction placed upon the land to promote the general welfare. It is in substance a taking of the land prohibited by the Constitution of the United States and by the Constitution of the State." So, in our case, by the continuous payment of taxes since 1936, and the continued effect of the zoning ordi-

nance, this tract has certainly become "no better suited for residence purposes." And the situation in this regard is most certainly not improving, but is deteriorating. The effect of a regulation which prevents all effective use is a confiscation. See cases just cited, and also: In Re Northeast Corner of E. Center Street & Chicago Avenue, Ohio Com.Pl., 186 N.E.2d 515; Krom v. The City of Elmhurst, 8 Ill.2d 104, 133 N.E.2d 1. And we note that this case does not involve a recent purchase of property with knowledge of the zoning, followed by an attempt to change the zoning; on the contrary, we have a situation where plaintiffs and their predecessors have owned the property for many years, have maintained it as a park or "buffer" zone, and have gradually seen the neighborhood undergo a vast change.

It is argued that any commercial use of this tract would require more city services, particularly fire and police; the evidence on this was vague and unimpressive; it is not even clear that there was any increase in the police force because of the building of the large shopping center at Clayton Road and Brentwood Boulevard. We feel that any possible increase in services necessitated here would be minimal and, of course, the city would collect more taxes on the developed property. This argument is of little weight in the over-all picture. Fire protection is furnished largely by cooperative arrangement with adjoining municipalities, and presumably the status of Richmond Heights would in nowise be altered.

█ While defendants properly assert that they are not bound by the zoning in Clayton, it is undoubtedly true that in its own zoning it must consider that matter, at least to some extent, from a *regional* standpoint. Some of the cases cited by defendants so state. Flora Realty & Investment Company v. Ladue, Banc, 362 Mo. 1025, 246 S.W.2d 771, 778 (citing Duffcon Concrete Products v. Borough of Cresskill, 1 N.J. 509, 64 A.2d 347, 9 A.L.R.2d 678); Wrigley Properties, Inc. v. City of Ladue,

Mo., 369 S.W.2d 397 (by necessary inference). In Forbes v. Hubbard, 348 Ill. 166, 180 N.E. 767, at loc. cit. 771, the court said: "* * * the considerations are not the comparative powers of neighboring villages, but conditions as they exist." And, while defendants' experts asserted that "strip zoning" along a busy commercial street is no longer considered to be good, city planning, both Richmond Heights and Clayton have gone too far in this respect to retrieve what was done years ago; the change in zoning theory is not, in itself, a sufficient reason for penalizing these plaintiffs. The argument is also made that, once this tract is rezoned the commercial area will "creep" eastward. This argument is not of any great validity. Not only does the city have that under its control (absent an arbitrary exercise) but here there would seem to be adequate "buffers" in the 20-foot strip running east from plaintiffs' tract, and in the very nature of the intersection itself.

█ The basic question here really is this: considering all these circumstances and facts, is the extent of the public interest and welfare great enough to outweigh the demonstrated detriment to the individual interests, and in the final analysis is this question a debatable one? On the latter phase a mere difference in the opinions of experts does not make such a question legally debatable. Illinois National Bank & Trust Company v. County of Winnebago, 19 Ill.2d 487, 167 N.E.2d 401; Forbes v. Hubbard, 348 Ill. 166, 180 N.E. 767. As has been said many times, each such case stands on its own facts and circumstances. City of Richmond Heights v. Richmond Heights Memorial Post Benevolent Ass'n, 358 Mo. 70, 213 S.W.2d 479; Flora Realty & Investment Company v. City of Ladue, Banc, 362 Mo. 1025, 246 S.W.2d 771. We cannot escape the conclusion here that the refusal to rezone this property is based primarily upon a desire to benefit (or conversely to refrain from possible injury to) the subdivision of Lake Forest, and that it

does not constitute a matter of substantial city-wide interest. The relationship of the owners in that subdivision to this tract has already been stated; they have done nothing to preserve the tract. They, alone, do not constitute the *public*, and their collective interests are not that "public interest" which must be weighed in any such zoning problem. Actually, the maintenance of the present zoning is primarily being defended for the collective benefit of private individuals. One expert witness for defendants more or less "let the cat out of the bag" when he testified: "Such a subdivision needs to be protected, preserved * * * perhaps the best use would be to leave it vacant." If the city wishes to condemn this property for park purposes, it should take steps to do so. Only 8 lots of the north tier in Lake Forest abut the strip (commercial and noncommercial) bordering Clayton Road; according to a plat exhibit there are only 5 houses on these lots and the ground of the westerly house abuts the "Pancake House" tract, but does not touch plaintiffs'. Thus only 4 residences would, upon a rezoning, be caused to abut commercial property for the first time, and, in our view, only those four could be affected. One of these owners spent several thousand dollars a few years ago in an effort to screen his property from the noise and traffic of Clayton Road by trees and shrubbery. It seems to us that the real detriment to those houses is Clayton Road itself. The nearest point of any such residence to plaintiffs' tract is approximately 125 feet; shrubs and trees are scattered over the area. We find that the damage which these residences might suffer from any ordinary commercial use which is reasonably adapted to that neighborhood, would be small as compared to the very substantial damage and injury now imposed on plaintiffs. We do not find that residences beyond the north tier in Lake Forest would be affected, and indeed one of defendants' experts so testified. We conclude thus the maintenance of the present residential zoning on plaintiffs' tract bears no "substantial relationship to the public

health, safety, morals, or general welfare," (Flora, supra) and that it therefore encroaches upon the protection accorded to citizens and property owners under the State and Federal Constitutions. We further hold that the present zoning classification, on these facts and under these circumstances, is so unreasonable and arbitrary that it infringes the rights of plaintiffs under the due process clauses (14th Amendment U.S.Const. Art. 1, § 10, Mo. Const., V.A.M.S.) of both the State and Federal Constitutions. We further hold that, on the evidence in this record, the question is not fairly debatable.

■■■ Having so ruled, it is unnecessary to pass specifically upon the additional contentions that the classification is discriminatory, and that plaintiffs' property is taken without compensation in violation of Art. 1, § 26, Mo.Const. We recognize that plaintiffs have had the burden of proving this classification to be unreasonable and invalid; in our opinion that burden has been sustained. Defendants say that plaintiffs concede that the zoning ordinance was valid when enacted in 1941, and that they have not shown a sufficient change in circumstances since to render it invalid now. What we have already said indicates that our view is to the contrary. The facts are shown in much detail in the record, and the Court may itself take judicial notice of the enormity of the changes which have taken place since 1941 in this area of St. Louis County.

■■■ Counsel state that plaintiffs have not cited one Missouri case where "this court has held a residential district classification to be unreasonable and arbitrary as applied to a particular parcel." That may be true, but the decision of each case rests upon its own particular facts and circumstances, and no appellate court has ruled on *this case*. Moreover, it is our duty to declare the law as we see it and not to vacillate because of the absence of a specific authority. The argument is entitled to much consideration, but it cannot be conclusive. There is a "first time" for nearly everything.

It is not our function (compare Sinclair Pipe Line Company v. Village of Richton Park, 19 Ill.2d 370, 167 N.E.2d 406, Nelson v. City of Rockford, 19 Ill.2d 410, 167 N.E.2d 219) to prescribe what commercial use shall be permitted on this property, especially since no specific plan or proposal has been filed. No very extensive commercial development is possible because of the size of the tract and the requirement by ordinance of off-street parking. Nor would any uses except those suggested in the evidence (retail or office) seem particularly feasible in the neighborhood. We only hold that the present ordinance No. 1685 is void as applied to the tract in question and that the application of plaintiffs for a rezoning to commercial usage must be granted. Appropriate injunctions may enforce such an order.

The judgment of the trial court is reversed, with directions to enter a judgment in accordance with the views expressed in this opinion.

All of the Judges concur.