**CITY OF MONETT, BARRY COUNTY, Missouri, a Municipal Corporation, Plaintiff-Respondent,**

v.

**William W. BUCHANAN and Mary Evelyn Buchanan, Defendants-Appellants.**

**No. 51597.**

Supreme Court of Missouri, Division No. 2.

Jan. 9, 1967.

Motion for Rehearing or to Transfer to Court En Banc Denied Feb. 13, 1967.

Almon H. Maus, Monnett, for plaintiff-respondent.

Neale, Newman, Bradshaw, Freeman & Neale, Paul L. Bradshaw, Springfield, for appellants.

BARRETT, Commissioner.

Started by the City of Monett as a suit to enjoin landowners, William and Mary Buchanan, from completing construction of a business building on six lots in a residentially zoned district, the cause has come to involve, as to this specific property, the validity, both as to enactment and enforcement, of the city's comprehensive zoning ordinance. The ordinance, finally adopted on August 8, 1961, placed the appellant-owners' six lots in District A a single-family residence zone. When the ordinance was adopted, however, there was then on the lots a partially constructed business building, commenced about a year previously, intended as a shopping center to consist of three stores. But when this suit was instituted in August 1962 the building had not been completed and the city, claiming that in the circumstances the building was in violation of the ordinance, sought to enjoin its completion. The circuit court enjoined completion of the structure and the landowners have appealed claiming that the ordinance had not been legally adopted and that as to their property it was arbitrary and unreasonable, that its classification had no relation to public welfare, and that its enforcement infringes their rights to equal protection and due process under both the state and federal constitutions.

The general area involved here is south of the main business and residential sections of Monett. Highway 60 runs east and west across the edge of the city's main business district and this area is south of Highway 60 and about one and one-quarter miles from the heart of the business district. North and south through the city and intersecting Highway 60 is Highway 37 and this area astride Highway 37 is south of the municipal golf course and a city park both of which are part of a larger area all zoned A residential. Unfortunately for those not intimately familiar with Monett, precise locations, dimensions and acreages are not fixed but roughly estimating after comparison to the Lautaret

tract of fifty acres immediately to the south of the six lots and south of a larger area once owned by the Buchanans, the lots are in a tract once consisting of about sixty acres. The sixty-acre tract fronts the west side of Highway 37 but these six lots as well as six lots to the north are separated from the highway by a fifty-foot street known as Plaza Drive. Directly across the highway from the six lots there is a tract of about twenty acres fronting the highway (also once owned by the Buchanans) and astride the highway and south of the twenty acres thirty or forty acres now comprising a platted subdivision known as Glenview Heights.

Again precise acreages are not fixed but in 1955 in the approximated sixty acres fronting Highway 37 the Buchanans acquired the north part, perhaps more than half of the tract, and subdivided it into a platted subdivision, Southern Heights Subdivision No. 1. Subsequently, 1958, they acquired another part of the acreage, perhaps all that remained of the parcel, and platted that into Southern Heights Subdivision No. 2. The six fifty-foot lots involved here are in the southeast corner of that subdivision, all separated from Highway 37 by Plaza Drive. In 1956 the Buchanans acquired "another piece of property," the tract directly across Highway 37 estimated here at about twenty acres, which they platted as Southern Heights Subdivision No. 3. Almost all the lots in subdivisions 2 and 3 have been sold and the subdivisions have become one of the choice, exclusive residential areas of Monett, all single-family residences costing from $20,000 to $65,000. The lots not sold, including the six involved here and six to the north, all facing Plaza Drive, belong to the Buchanans. It does not appear just how subdivision 3 across the highway has developed except that in 1961 the Buchanans sold some part of the tract (unspecified as to size) fronting the east side of Highway 37 for $5000 and in 1962 a gasoline filling station was constructed on the site and sold for $10,000.

In this background as to the property involved here the City of Monett, pursuant to Chapter 89, RSMo 1959, V.A.M.S., and following a final report by a duly constituted zoning commission, adopted a comprehensive zoning ordinance. It is not necessary here to recount its provisions, it is sufficient to say that it is a conventional zoning ordinance and classified the Buchanan's property including lots 1 to 6 in Southern Heights Subdivision No. 2 as A residential, single-family residence, saving of course any nonconforming use in existence when the ordinance was adopted on August 8, 1961.

The appellant-owners' first point is that the city failed to follow certain "statutory procedural requirements" and that, therefore, the ordinance was not "validly enacted," and, presumably, is void. This point has to do with these circumstances taken for the most part from a stipulation of facts entered into by the parties. On March 24, 1961, the zoning commission, pursuant to a notice officially published in the Monett Times, held a public hearing "on a proposed zoning ordinance and zoning map." While the appellants say and it may have been the fact that the first map produced before the commission indicated that their property would be in a C local business district, the official map placed all property west of Highway 37, including their six lots, in an A single-family residential zone. The appellant Buchanan appeared at that commission meeting and protested the "proposed residential zoning." On March 29, 1961, the commission again met and so amended the zoning map as to change the appellants' six lots from zone A to zone C and thereupon reported the ordinance and the amended map to the city council. On April 28, 1961, pursuant to another official notice published in the Monett Times the city council "held a public hearing upon said proposed zoning ordinance and zoning map." Mr. Buchanan attended that meeting but the map then zoned their lots as C local business. After April 28 the council held "several informal meet-

ings and discussions" concerning the ordinance and map and on August 8, 1961, enacted the ordinance and "changed portions of defendants' property from zone 'C' (as recommended by the Commission) to zone 'A.'"

The appellants, conceding that the council meeting of April 28, 1961, attended by Buchanan, was held "pursuant to the required statutory notice," contend that because no action was taken at that meeting, several informal meetings intervening, there was no other and further notice of the council meeting of August 8, 1961, when the ordinance was adopted placing lots 1 to 6 in zone A and therefore they say the ordinance is invalid. There was, however, in the Monett Times of July 28, 1961, "an article * * * to the effect that the Council would consider the ordinance in its changed form," as the editor said, "as it will be passed in the near future by the Monett City Council." Appellants say that this article which printed the full text of the ordinance did not come to their attention until four or five days after August 8, 1961. In short the appellants' point is that a second or another officially published notice was a necessary prerequisite to a valid adoption of the ordinance by the council. Conceding that "no Missouri case has passed on the question" the appellants pose the problem in this language: "After notice has been given and a hearing has been held on a particular zoning proposal, is the City Council free to pass some other and different proposal several months later without any further notice; or is the Council limited to a consideration of the proposal concerning which notice was given."

The appellants' is one way of stating the problem but the weakness of the statement is that it does not present the issue in its context and is not of course all the points of view nor all facets of the question. There was official publication of two notices, one by the zoning commission for its meeting and another by the council for its first meeting and it is assumed for the purposes of this opinion that the statutes required publication of fifteen days' notice of the time and place of at least initial hearings before both the commission and council. RSMo 1959, §§ 89.050, 89.060 and 89.070, V.A.M.S. No one is complaining of the fact, certainly not the appellants since in the end the zoning commission made a recommendation favorable to them, but the first and only notice of the zoning commission's meeting on March 24 was published on March 9. Mr. Buchanan attended that meeting but the commission did not take final action on that date, instead, and without further notice, the commission again met on March 29 and it was on that date that the commission changed the zoning of the appellants' property from A to C. As to the council, Mr. Buchanan attended its first meeting on April 28 and thereafter there were "several informal meetings," and publication of the full text of the ordinance on July 28.

Despite appellants' protestations and insistence on further official formalities these mere record recitals do not reveal all the meaningful facts as to public knowledge, not only of the meetings of both commission and council but the magnitude of the issue and the excitement if not passion engendered by the contending parties and forces. In the first place the Buchanans platted and developed these three subdivisions and Nos. 1 and 2 have become successful and exclusive residential areas and the six lots are an integral part of the second subdivision and to place them in a C zone it is necessary, in effect, to transfer them to the third subdivision and other subdivisions across Highway 37. In any event, on the one hand, in active support of C zoning there were the appellant-owners and developers and in opposition, openly or tacitly, there were the thirty-five or more purchasers of lots and builders of one-family homes. The mere record recital of official and informal meetings does not begin to indicate how the issue was bruited about, nor does the transcript reveal the earnestness of arguments advanced or the forces brought to bear on commission and

council by the contestants. There are some clues, however, in the testimony of Mr. Buchanan on the one side and Mr. Rose, a realtor member of the city council and a lot-purchaser in Southern Heights Subdivision No. 1, on the other side.

 One other somewhat collateral matter should be noted at this juncture, both the zoning commission and the council were not concerned alone with the appellants' six lots or with the homeowners in the two subdivisions. The zoning commission and the council were concerned, as the statutes contemplate (RSMo 1959, Ch. 89, V.A. M.S.) with the difficult and serious problem of adopting a comprehensive zoning law for all of Monett. This fact is overlooked in some measure by the parties as indicated by their citation of cases. This is not to minimize the individual owner's rights, here the Buchanans, but there is a difference in "rezoning," "variance" (101 C.J.S. Zoning § 275, p. 1040) and the exercise of the power to zone and to enact a comprehensive zoning ordinance in the first instance. 101 C.J.S. Zoning § 11, p. 693. This phase of the problem could be pursued at length but it is sufficient to say, as assumed, that notice and hearing are necessary prerequisites to the valid enactment of a comprehensive zoning ordinance. City of Moline Acres v. Heidbreder, Mo., 367 S.W.2d 568; State ex rel. Kramer v. Schwartz, 336 Mo. 932, 82 S.W.2d 63. And, it may be added, in the amendment of an existing ordinance, as in its original enactment, notice and hearing are necessary. Wippler v. Hohn, 341 Mo. 780, 110 S.W.2d 409; State ex rel. Sims v. Eckhardt, Mo., 322 S.W.2d 903. And in either amendment or initial inclusion so as to residentially zone an existing nonconforming use certain factors must be noted, certain formalities observed, and in the end the action must not in the particular facts be arbitrary and unreasonable. Huttig v. City of Richmond Heights, Mo., 372 S.W.2d 833; Glencoe Lime & Cement Co. v. City of St. Louis, 341 Mo. 689, 108 S.W.2d 143.

But the repetition of these general principles does not solve the problem presented here, in both adoption and amendment notice is required and "(t)he most perplexing problem in the area of applicability concerns measures noticed in one form and passed in another." Annotation 96 A.L.R. 2d 449, 457. To go immediately to the crux of the problem, it may only be said that in all probability there are two views: "According to one view, where sufficient notice is given prior to the hearing, the municipal zoning body may make changes or amendments to the proposed regulation in the course of its passage without giving further notice, or without another public hearing; under other authority, a zoning ordinance may be void where substantial amendments are made after the public hearing on the proposed ordinance without any new hearing on the changes and amendments." 101 C.J.S. Zoning § 11(b) p. 697. Of course, what constitutes a *substantial* change is in itself a vexing problem and may depend on one's point of view and interest, as here. But in this area also each case must be viewed in its particular circumstances and "compliance may be excused where the contesting party suffered no prejudice or other harm as a result of the improper notice, or where, despite its alleged deficiencies, he was sufficiently informed to have attended the hearing or at least to have known that it was taking place. Some courts have further recognized that a litigant may waive or be estopped from asserting improper notice and others indicate that an inordinate delay in the attack which results in the vesting of third persons' rights may be a relevant excusatory consideration." 96 A.L.R.2d l. c. 456; State ex rel. Luechtefeld v. Arnold, Mo.App., 149 S.W.2d 384.

 Ultimately the appellants' complaint here is that the council did not adopt the recommendation the zoning commission finally made, after having changed it, that their six lots be zoned C rather than A but, insofar as notice is involved, they "had no right to assume that the legislative body

(the city council) entrusted with the sole power to enact a comprehensive zoning or rezoning ordinance in Baltimore County was bound to adopt the proposals or recommendations submitted by the Zoning Commissioner," and it may be added, especially after the council has once heard the appellants and is fully informed as to the basic problem. Hewitt v. County Commissioners of Baltimore County, 220 Md. 48, 151 A.2d 144, 149; Ciaffone v. Community Shopping Corp., 195 Va. 41, 77 S.E.2d 817, 39 A.L.R. 2d 757. While it involved a zoning order, 465 acres of land and 1200 homes, the case nearest in point on its physical facts as well as appearance of objectors and the sufficiency of notice is Ridgewood Land Company v. Simmons, 243 Miss. 236, 137 So. 2d 532. The only complaint here is the lack of a second notice, a notice that the council would meet again or at another time before finally voting and enacting the ordinance. There is no claim that the council was bound in any and all events to finally dispose of the proposed ordinance at the duly called meeting on April 28 or that it had no authority to adjourn and meet from time to time. And there is no claim that the statutes in specific terms, §§ 89.030–89.070, require a second or further notice once the council gave a proper notice and conducted a hearing attended by objectors. And finally there is no suggestion "of improper motives on the part of the zoning authority" (the city council), a compelling factor in individual instances. 96 A.L.R.2d 1. c. 457. In conclusion upon this point, in the circumstances of this record it may not be said that the ordinance was not validly adopted solely because there was no officially published notice of another meeting of the city council at which the ordinance would be finally voted on and enacted. State ex rel. Better-Built Home & Mortgage Co. v. Davis, 302 Mo. 307, 259 S.W. 80; State ex rel. Luechtefeld v. Arnold, supra.

■ In their second point the appellants invoke the general rules governing the validity of zoning ordinances, including the ever present generality of each case on its particular facts, and contend that the zoning of these six lots for class A residential use only was arbitrary and unreasonable and therefore a denial of due process and equal protection under both state and federal constitutions. It is not necessary to elaborate on this point as with the notice, the matters noted there, however, have some relevance and bearing. The classification of areas, under the statutes, is "a legislative function, and the city legislative body has the right and duty 'to determine the use classification to be given any particular area,' " (Downing v. City of Joplin, Mo., 312 S.W.2d 81, 83; Landau v. Levin, 358 Mo. 77, 213 S.W.2d 483) and it is not the function or prerogative of courts to substitute their opinions for those of the city unless manifestly or demonstrably arbitrary and unreasonable as in Huttig v. City of Richmond Heights, supra, and Glencoe Lime & Cement Co. v. City of St. Louis, 341 Mo. 689, 108 S.W.2d 143. And inasmuch as it is repeatedly cited, it may be said in passing that this case is not comparable to the "twelve blocks * * * extending east and west along East Seventh Street" in Joplin. Downing v. City of Joplin, supra.

■ The mere fact that property across the highway or even in an adjoining area is zoned business is not conclusive, if the city's action is "reasonably doubtful or even fairly debatable" a reviewing court on appeal may not substitute its judgment for that of the city (Landau v. Levin, supra) and classification is not unreasonable because of the lack of proximity and complaints of neighbors. Ryan v. City of Warrensburg, 342 Mo. 761, 117 S.W.2d 303; Deacon v. City of Ladue, Mo.App., 294 S.W.2d 616. Here as in Flora Realty & Investment Company v. City of Ladue, 362 Mo. 1025, 246 S.W.2d 771, and numerous other cases, although they did not involve original enactments, there was conflicting evidence or conflicting inferences as to five or more significant factors, some of more compelling force than others depending on particular circumstances. And here there was a conflict of testimony as to the

highest and best use of the six lots, a conflict as to the amount of damages to the owners if restricted to residential rather than business use, a conflict as to increase or decrease in traffic, noise and general comfort if devoted to one use or another, all culminating in the compelling fact, that commercial rather than residential zoning certainly as to Southern Heights Subdivisions 1 and 2 of which the six lots are a part, would "clearly interfere with the general zoning plan adopted for the benefit of the entire community," and, it may be paraphrased, as undoubtedly contemplated by the appellants when they platted the subdivisions. The classification here not being demonstrably unreasonable or arbitrary, particularly in view of the conflict of testimony, there is no manifest denial of equal protection or due process. Landau v. Levin, supra; Deacon v. City of Ladue, supra; Ryan v. City of Warrensburg, supra, and Williams v. Village of Schiller Park, 9 Ill.2d 596, 138 N.E.2d 500.

■ The ordinance contained a provision, as of necessity all zoning ordinances must, exempting from its immediate operation existing nonconforming uses but upon discontinuance of that use a classification in conformity with the standards of the ordinance becomes effective: "The lawful use of land existing at the time of passage of this ordinance, although such use does not conform to the provisions hereof, may be continued but if such nonconforming use is discontinued, any future use of said premises shall be in conformity with the previous provisions of this ordinance." In this connection another provision permitted completion of a structure commenced prior to the enactment of the ordinance and the restoration of a partially destroyed building. Insofar as material here the section provided that "Nothing herein contained shall require any change in the plans, construction or designated use of a building, *the construction of which shall be commenced prior to the date of the passage of this ordinance, and the completion of which shall be affected* (sic) *within one*

*year of the date of the passage of this ordinance.*" The same section permits the restoration of a nonconforming building partly destroyed by fire or an act of God subsequent to the passage of the ordinance; *"provided such building is not destroyed to the extent of more than seventy-five* (75) *percent of the reasonable valuation."*

While the parties have occasionally assumed the existence of a nonconforming use on the date the ordinance was passed, August 8, 1961, the actual fact was that on that date there was no finished, completed nonconforming building or existing nonconforming use. And the actual existence of a nonconforming use when the ordinance was passed is not the appellants' theory here. The pleading and the proof is, Mr. Buchanan said in August 1960, that the appellants had "commenced construction of a building on said land, but thereafter wholly abandoned the same and caused no construction to be done on said premises for a period of several months until on or about the 2nd day of August 1962," (within six days of one year) when they "caused construction on said building to be again commenced and that *more than one year from the effective date of said ordinance has passed, but the construction of said building is not completed.*" The fact was that on that date, August 8, 1961, the appellants had completed the "footings and foundation" of a commercial building but there was no finished structure. And this is the theory of the appellants' case and defense to a violation of the ordinance, a structure "in the course of construction at the time of the enactment or effective date" of the zoning law. 58 Am.Jur. (Zoning) § 149, p. 1022. Also with specific reference to the ordinance, when construction was resumed in August 1962 the appellants had "completed the walls (concrete blocks) and got ready to put the steel decking on it" but admittedly "couldn't complete a whole building" by August 8, 1962, although they said that the structure could have been completed within a year. So to recapitulate, work was originally started in August 1960

but from October 1960 to August 1, 1962, whatever the reasons or excuses, there was no work on the building in that period of time. The appellants say that after again starting in August 1962 the building could have been completed but here again Mr. Buchanan "thought he had a ten day period there before it (the ordinance) became effective." In any event the building 50% complete, later looking at a photograph he said 95% complete, could not have been completed by August 8, 1962. In the meanwhile, about one year prior to the date of the trial (June 1, 1964) a windstorm blew some of the inner walls down and in February or March another windstorm blew down 65% of the back wall and otherwise damaged the partially built structure. The appellants say that when the windstorms struck they had spent approximately $7500 on the building, and by reason of both storms collected $5000 under a builder's risk insurance policy.

In this briefly noted background the appellants' third and final point is that they had a valid nonconforming use, a vested property right (State ex rel. Capps v. Bruns, Mo.App., 353 S.W.2d 829) which they had not abandoned and which was not lost by their failure to complete the building within a year or by its subsequent partial destruction by windstorms.

▆ And again, this phase of the whole problem could be pursued in its many facets, factual and legal, but detailed exploration is not necessary to a disposition of the appeal, on these as on all issues there was a conflict of testimony as well as of permissible inferences. Among other circumstances relied on as excusing failure to complete the building was, from August 8, 1961 to August 8, 1962, a lack of ability to secure financing, and, suspension of nonconforming use due to financial difficulties may negative an intention to abandon a nonconforming use. Annotation 18 A.L.R. 2d 725, 748, concerned in part with the right to resume a nonconforming use after a pe-

riod of nonuse. And see Smith v. Howard, (Ky.) 407 S.W.2d 139. But it is not necessary to explore in depth the subject of abandonment of a nonconforming use or its loss due to a partial destruction—all with reference to the ordinance, it is sufficient here to say that one of the primary purposes of zoning is to strictly limit and eventually eliminate all nonconforming uses. Hoffmann v. Kinealy, Mo., 389 S.W.2d 745; Women's Christian Association v. Brown, 354 Mo. 700, 190 S.W.2d 900; 2 Rathkopf, Law of Zoning, § 7, p. 61–14.

▆ And ordinance conditions or prohibitions against reconstruction after 75% destruction or failure to complete a commenced construction within a year as destroying the nonconforming use are both valid, enforceable provisions. Beszedes v. Board of Com'rs of Arapahoe County, 116 Colo. 123, 178 P.2d 950; Palazzola v. City of Gulfport, 211 Miss. 737, 52 So.2d 611; Boward v. County of Cook, 27 Ill.2d 52, 187 N.E.2d 676; Annotation 87 A.L.R.2d 5, 106. The appellants projected a shopping center of three stores but they had not only not completed the building, no part of subdivisions 1 and 2 had ever in point of fact been used or devoted to any business or commercial purpose. And while Mr. Buchanan insisted that he intended to complete the structure and eventually put it to business use, he had found only one possible tenant at $90 a month and admittedly could not have completed the building within a year, "No one could," he said. "An intention on the part of the owner of a property to put it some day to a nonconforming use or to resume such use after it has been to all intents and purposes completely discontinued is insufficient to preserve the owner's right to a nonconforming use of the property." 18 A.L.R.2d 1. c. 744. While a permit case there is an analogous and compelling lesson in the thoroughly considered case of Brown v. Gambrel, 358 Mo. 192, 213 S.W.2d 931, in which owners sought to change a nonconforming public stable into a dance hall or an "indoor

amusement park." There as here the proposed building was suitable only for business use while the land itself was adaptable to and appropriate for residential use. And there as here it could reasonably be said that "before the change was effected the economic advantage of the nonconforming use (public stable) had all but 'faded out' and the 'economic' use of the land was all but blended with the conforming (residential) use of the district or zone in which the property is situate." As stated, the one-year completion provision is valid, the building was not and could not have been completed within the year and it was not a condition precedent to the validity and operative effect of the ordinance, as the appellants claim, that it must first be found as a fact that they had "abandoned their non-conforming use"—as those terms are defined generally. Annotation 87 A.L.R.2d 4, 8. But if technical abandonment is insisted upon there is a further applicable analogy in Brown v. Gambrel, 358 Mo. 1. c. 202, 213 S.W.2d 1. c. 937, the appellants "prolonged the non-conforming use-life of their building in violation of the imposed limitations on non-conforming uses and did violence to the purpose and intent of the zoning laws, depriving themselves of a legally authorized use of their property as a public dance hall. Thus by their own acts was the continuance or continuity of lawful non-conforming use of their property broken. There was no non-conforming use of appellants' property lawfully existing January 1, 1947,"—here August 8, 1962.

For all the reasons indicated the judgment is affirmed.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.