Arthur **LOOMSTEIN** et al.,
**Plaintiffs-Appellants,**

v.

**ST. LOUIS COUNTY, Missouri,**
**Defendant-Respondent.**

**No. 40634.**

Missouri Court of Appeals,
Eastern District,
Division Four.

Nov. 18, 1980.

Summers & Compton by Ronald N. Compton, Clayton, for plaintiffs-appellants.

Thomas W. Wehrle, St. Louis County Counselor, Marilyn K. Wallach, Asst. County Counselor, Clayton, for defendant-respondent.

SATZ, Judge.

Plaintiffs own land in St. Louis County and, in 1977, they petitioned the St. Louis County Council to re-zone their property from a R–7 residential classification to a C–3 commercial classification.[1] One of the most intensive uses permitted by R–7 is a multi-family apartment complex. However, plaintiffs proposed to use their property for a fast food restaurant and, therefore, sought the rezoning. The County Council denied plaintiffs' request.

Plaintiffs instituted this action against defendant St. Louis County for declaratory judgment, seeking a declaration that the continuance of the R–7 classification was arbitrary, unreasonable and confiscatory, and that the refusal to rezone the property C–3 commercial was an abuse of the Council's discretion. The trial court found the continuance of the classification was valid and reasonable, and not arbitrary and confiscatory. Plaintiffs appeal and assert the trial court erred in concluding (1) the continuance of R–7 zoning on the subject parcel was not an unconstitutional taking of plaintiffs' property, (2) the continuance of R–7 zoning of the subject parcel was not arbitrary and unreasonable, and (3) the refusal to rezone the property to C–3 was not an abuse of discretion by the County Council. Finding plaintiffs' second assertion to have merit, we reverse.

Plaintiffs' property is located in St. Louis County on the northside of Olive Street Road (Olive), about 1000 feet west of the intersection of Olive and Woods Mill Road (Woods Mill). The parcel is 0.85 acres. We set out a rough sketch for reference in describing the surrounding and neighboring property.

1. R–7 zoning allows for single family dwellings, two-family dwellings, three-family dwellings, multiple-family dwellings, churches, public or private schools or day nurseries, not-for-profit libraries, parks and playgrounds, home occupations, fire stations, local and public utilities and certain commercial uses when located within a multiple-family structure.

C–3 zoning allows for commercial uses "catering to the general public", including fast food restaurants, stores, service facilities, markets, offices, recreational facilities, other than drive-in theatres, golf practice driving ranges and outdoor swimming pools, libraries, meeting rooms, auditoriums, theatres, churches, parking lots, garages, mortuaries, fire, police and other governmental facilities.

As can be seen, the parcel is bounded on the east by Forum West Shopping Center, zoned C–2 commercial,[2] on the north by the Forum West Condominiums and on the west by a pool and clubhouse for the residents of Forum West Condominiums. Property further to the west, fronting on the northside of Olive, is zoned residential and is undeveloped.

On the southside of Olive, directly across from plaintiffs' property, lies another corner commercial development, the Four Seasons Shopping Center. Zoned C–2, this center has a supermarket, a number of small stores, a cinema and offices. The property immediately to the west of this center was zoned R–6 until 1975, when it was rezoned to C–8.

Across Woods Mill, to the east of the Four Seasons Center and on the southside of Olive, is a corner gas station, zoned C–2. Moving east, there is an interior decorating shop located on land zoned R–3, operating as a non-conforming use, and then a Steak and Shake Restaurant, rezoned C–8 from R–3 in 1975.

On the northside of Olive, and going east from Woods Mill, there is another corner gas station, a shopping plaza and a Jack-In-The-Box restaurant, all zoned C–2. This area is surrounded by property zoned R–7 and R–6A.

The eastside of Woods Mill, running south from Olive, has also been commercially developed. Moving south from the corner gas station, there is a vacant parcel, followed by a second vacant parcel, rezoned from residential to C–8 in 1973, a Barclay Jack's Restaurant, rezoned from residential to C–8 in 1973, and beyond that, the Forest Lake Tennis Club, rezoned from residential to C–8 in 1975.

In this area, Olive is a heavily traveled thoroughfare with an average daily traffic volume of about 14,000 vehicles. To alleviate previously existing traffic problems, Ol-

ive has been widened from 2 lanes to 5 lanes, a width of about 100 feet.

In summary, plaintiffs' property is situated in or near a highly developed commercial area. Plaintiffs contend that maintaining R–7 zoning on their property in this commercial setting was arbitrary and unreasonable and, therefore, unconstitutional.

■ In reviewing this contention, we are guided by the principles set forth in *Vatterott v. City of Florissant*, 462 S.W.2d 711, 713 (Mo.1971):

> "Whether the classification and enforcement of a zoning ordinance is reasonable and constitutional or whether it is arbitrary and unreasonable and therefore unconstitutional in its application to a specific property depends upon the evidence and the facts and circumstances of each case.... The legislative body has the duty to determine the use classification for any particular area. Unless it appears that determination by that body is arbitrary and unreasonable, the court cannot substitute an opinion for the council's determination. If the council's action is fairly debatable, the court cannot substitute its opinion. The legislative body's enactment is clothed with a presumption of validity, and he who would challenge the reasonableness of the ordinance as applied to specific property has the burden of proving unreasonableness.... These concepts apply equally to rezoning and refusal to rezone.... (citations omitted)."

Thus, we must first review plaintiffs' evidence to determine whether they have successfully rebutted and overcome the presumption that continuance of R–7 zoning on their parcel was reasonable. If they have, we must then review defendant's evidence to determine whether its evidence makes the continuance of this zoning fairly debatable. *See Vatterott v. City of Florissant, supra* at 713–14. If so, the judgment of the

---

**2.** Zoning classifications C–1 through C–8 permit commercial development of property. Classifications R–1 through R–7 allow residen- tial development. The precise nature of the development permitted under each classification is not important to this decision.

trial court must be affirmed; and, if not, the judgment must be reversed.[3]

■ Zoning is lawful only when it bears a substantial relation to the public welfare. If the public welfare is not served by the zoning or if the public interest served by the zoning is greatly outweighed by the detriment to private interests, the zoning is considered to be arbitrary and unreasonable and, therefore, violative of the due process clauses of our State and Federal Constitutions. *Huttig v. City of Richmond Heights*, 372 S.W.2d 833, 842–843 (Mo.1963); *Herman Glick Realty v. St. Louis County*, 545 S.W.2d 320, 325 (Mo.App. 1976). Thus, the determination whether a zoning ordinance is arbitrary and unreasonable requires the weighing of the detriment to private interests against the benefit to the general public, *Huttig, supra* at 842; *Glick, supra* at 325; and, in order for plaintiffs here to overcome the presumption that the R–7 zoning in question is reasonable, they must show a detriment to their private interest which greatly outweighs any benefit to the general public. We find that they did.

■ In attempting to balance the competing private and public interests, our courts have isolated several factors which merit consideration, but no single factor is determinative or controlling. *See, e. g., Ewing v. City of Springfield*, 449 S.W.2d 681, 690–691 (Mo.App.1970). To determine the detriment, if any, to plaintiffs' private interest, we determine the adaptability of the property for the permitted use, *Huttig v. City of Richmond Heights, supra* at 841; *Herman Glick Realty v. St. Louis County, supra* at 324, and we look to the effect of the zoning on the value of plaintiffs' property, *Huttig v. City of Richmond Heights, supra* at 840; *Desloge v. County of St. Louis*, 431 S.W.2d 126, 135 (Mo.1968), *Ewing v. City of Springfield, supra* at 689. Using these criteria, the trial court concluded that development of plaintiffs' property as zoned was architecturally sound and economically feasible and, therefore, concluded the property had value as currently zoned. These conclusions are not supported by the evidence and, upon the present record, they are not even fairly debatable.[4]

Plaintiffs' evidence demonstrated that development of plaintiffs' property under R–7 zoning was not economically feasible. Plaintiffs' first expert, Preston Bank, a real estate appraiser and broker, noted that plaintiffs' trapezoidal parcel of property contained about 36,994 square feet, and he also noted that R–7 zoning allows one dwelling unit per 1,750 square feet. There-

---

3. In conducting our review, we naturally give due deference to the trial court's views on the credibility of witnesses. Here, the trial court made no explicit expression on the credibility of witnesses. Moreover, in zoning cases, "the matter of credibility, as such, occupies a very narrow field; the questions are rather those of judgment, and the logic (or lack of it) in expert opinions". *Huttig v. City of Richmond Heights*, 372 S.W.2d 833, 839 (Mo.1963). In addition, in conducting our review, we are aware of the standards for review imposed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976) and are equally aware that a variance from those standards may have been suggested for the review of decisions of a legislative body in *Binger v. City of Independence*, 588 S.W.2d 481, 486 (Mo. banc 1979). However, under either set of standards, we would find that plaintiffs should prevail.

4. Plaintiffs complain about three evidentiary rulings of the trial court. Plaintiffs contend that defendant's Ex. J a "pro-forma" financial statement reflecting the profitable operation of a multi-family apartment complex, was im-properly admitted because defendant's counsel prepared the statement and, plaintiffs argue, this statement was not adopted by the expert defendant proffered as the sponsor of the statement. Plaintiffs also contend the testimony of two Forum West Condominium owners-trustees was improperly admitted because their testimony was irrelevant. Plaintiffs finally complain that a written statement by the County Counselor to the County Council that it was "virtually infeasible" to develop plaintiffs' property residentially was an admission of an agent, the County Counselor, binding on his principal, the defendant County, and the trial court improperly failed to use or give proper weight to this admission. We do not address or reach the issues raised in plaintiffs' complaints. Plaintiffs prevail even if the exhibit and testimony complained about in their first two complaints are made part of the record; and plaintiffs, likewise prevail even if the "admission" complained about in their last complaint is not made part of the record.

fore, he acknowledged that it was mathematically possible to place 21 dwelling units on plaintiffs' property. (21 × 1,750 = 36,750). However, according to Bank's detailed analysis this theoretical 21 unit apartment complex would produce a yearly deficit of $17,000, if it could be built on plaintiffs' property. A 16 unit complex would be even costlier and would produce an even greater deficit. Bank even questioned the feasibility of a developer obtaining financing for either a 16 or 21 unit complex on plaintiffs' property.

Two other experts for plaintiffs agreed with Bank that development of plaintiffs' property under R–7 zoning was not feasible. Thomas McReynolds, a real estate appraiser, explained in detail why the small size of plaintiffs' lot and its location on a major thoroughfare made residential development undesirable and financially infeasible. Jack Tyrer, an architect with experience in designing commercial and residential developments, agreed with this assessment. In equal if not greater detail, he explained that while it was "academically" possible to build a 16 unit complex on plaintiffs' property, it was not financially feasible, primarily because of the size of the property. Thus, plaintiffs' evidence clearly rebutted any presumption that it was economically feasible to develop their property under R–7.

In contrast, the defendant County failed to show the development of plaintiffs' property under R–7 zoning was a fairly debatable issue. The County attempted to demonstrate the economic feasibility of this development through the testimony of Gary Crabtree and David Levinson.

At the time of the hearing, Crabtree had been with the St. Louis County Planning Department since 1972 and was then the Coordinator of the Current Planning Division. He is not an architect or civil engineer. His primary educational background was in urban affairs and mathematics.

Crabtree sponsored defendant's Exhibits D and E. These exhibits were schematic drawings used solely for the purpose of showing the possible placement of a 21 unit multi-family apartment complex on plaintiffs' property. The schematics were not detailed floor plans or working drawings of the individual apartment units. Rather, they were simply the perimeter outlines of apartment units which, apparently, had been built on other projects. Crabtree referred to the schematics as representing "modules". Each "module" was approximately 30 × 50 feet, i. e., 1500 square feet, and each "module" represented two dwelling units, i. e., at best, 750 square feet per unit. Since the schematics were not detailed floor plans, they did not account for hallways, stairways or wall thicknesses. Thus, the 750 square feet was gross space and not net rentable space.

Through witness Levinson the County attempted to show that a 21 unit apartment complex could be operated profitably. Levinson is a real estate developer who was formerly associated with Forum West Condominiums and other apartment developments. In addition to his other testimony, he was called by the County to sponsor a "pro-forma" income and expense statement, defendant's Exhibit J, which showed that it was possible to profitably operate a 21 unit multi-family apartment complex, with dwelling units having 800 square feet of rentable space. Levinson did not prepare the statement. Defendant's trial counsel did. Arguably, Levinson's testimony did not make him a proper sponsor for this statement, but, for our purposes here, we assume he did adopt the statement and properly became its sponsor.[5] As its sponsor, however, he simply testified that the "pro-forma" statement was accurate if one accepted the hypothetical project upon which the statement was based. As noted, the statement assumed the dwelling units contained 800 square feet of rentable space, but the record does not show that an apart-

---

5. Apparently, the statement itself was first shown to Levinson on the day of trial. At first, he appeared to disclaim any personal knowledge of the Exhibit, but, then, he later stated that "it would be fair to say that (he) did assist in the preparation of this exhibit". Also, plaintiffs did cross-examine Levinson about the accuracy and the validity of the statement.

ment complex with 21 dwelling units of this size can be designed to fit on plaintiffs' property. To the contrary according to Crabtree's testimony the schematic drawings representing this complex show dwelling units of no greater than 750 square feet, without space being allocated for hallways, passageways or wall thicknesses. As a factual matter, on rebuttal, plaintiffs demonstrated through their expert Tyrer that given the gross space represented by the schematic drawings, the greatest amount of net rentable space would be 625 square feet. Thus, the County failed to link its "pro-forma" operating statement to the particular apartment complexes shown in its schematic drawings and the "pro-forma" statement merely demonstrates the economic feasibility of a hypothetical project which is not necessarily connected to plaintiffs' property.

After examining this evidence of the County, we are left with little or nothing to contradict plaintiffs' evidence that development of the property as zoned is not feasible. Thus, we find the trial court erred in concluding that plaintiffs' property could be profitably developed as zoned and was adaptable to the permitted use.

The trial court also concluded that the property had substantial value zoned residentially. The court placed no precise value on the property and it is unclear exactly on what evidence it relied in reaching its conclusion. The County's experts did not attempt to put a dollar value on the property. However, plaintiffs' experts did testify as to value, and, in answer to an interrogatory, plaintiffs stated that, although no fair market value had been established by appraisal, they believed the property as zoned had a fair market value of "$75,000.00 or substantially less". We examine these last two items of evidence.

Plaintiffs' expert Bank stated that the typical or average price for land to be developed for multi-family uses was $2,000 per unit placed on the land. This would translate into a value of $32,000–$42,000 for plaintiffs' parcel, if 16 to 21 units could be developed on the parcel. The $32,000 to $42,000 evaluation, however, reflects a value which could be placed on the property, if but only if, residential development of the property would be architecturally sound and economically feasible. Bank so testified. Similarly, McReynolds evaluated plaintiffs' property at $42,000–$55,000, based upon the number of units which could be developed on the property. Neither witness testified, explicitly or implicitly, that these units could be profitably developed on plaintiffs' property. Thus, neither witness' testimony indicates or shows that plaintiffs would simply make more off the property if it were rezoned commercially; rather, the testimony of each indicates that no effective use can be made of the property as currently zoned and, hence, no meaningful value can attach to the property. However, these experts placed the value of the property as zoned commercially between $92,000 and $111,000.

In their noted answer to the interrogatory, plaintiffs did not purport to place a firm value on their property. They set a maximum and stated that the property might be worth substantially less than that maximum. At best, the answer was equivocal. Moreover, all of the evidence produced by plaintiffs at trial indicated the value of the property to be substantially less than $75,000. Thus, any admission plaintiffs may have made was made even more equivocal at trial. Such an admission is entitled to little, if any, weight. *O'Neill v. Claypool*, 341 S.W.2d 129, 134 (Mo.1960); *Dougherty v. Pennypack Woods Home Ownership Ass'n*, 181 Pa.Super. 121, 124 A.2d 703, 707 (1956). The $75,000 value indicated by plaintiffs in their response is sensibly construed as reflecting their belief of the value of the property so long as the potential for commercial zoning existed. This is consistent with the testimony of their experts at trial, who placed the value of the property at substantially less than $75,000, even if the property could be developed residentially. It is likewise consistent with plaintiffs' own equivocation on the $75,000 figure. Further support for this interpretation lies in the fact that $75,000 is the approximate amount paid by plaintiffs for their interest

in the property under the belief it could be rezoned commercially. We conclude the property has no substantial value as currently zoned and the trial court erred in its finding to the contrary.

Having determined that the current R–7 zoning caused this detriment to plaintiffs' interest, we still must determine whether plaintiffs have shown that the current zoning cannot be justified as serving a public interest which outweighs the detriment to plaintiffs' private interest. We look first to the zoning and use of surrounding property. *See Huttig v. City of Richmond Heights, supra* at 840; *Ewing v. City of Springfield, supra* at 689. This factor has proved to be critical in the past. *See, e. g., Tealin Co. v. City of Ladue,* 541 S.W.2d 544, 549 (Mo. banc 1976); *Vatterott v. City of Florissant, supra* at 715. As we noted in detail at the beginning of this opinion, the subject parcel is located on a major thoroughfare in an area which has been subject to a great deal of commercial development in the past 10 years. Indeed, the expert for the County acknowledged that the County has recently changed the zoning classification on several parcels in the area from residential to commercial. He also admitted that plaintiffs' property could be rezoned from residential to certain types of commercial without damage to the public interest. No extended dissertation is needed to demonstrate that the R–7 zoning is not consonant with the surrounding existing uses or the zoning or authorized uses of similar nearby property.

Admittedly, the property immediately adjacent to the subject property on the north and west is zoned residential, and Crabtree, the County's planner, also stated the subject parcel was zoned as part of a master zoning plan with the R–7 property to serve as a buffer between commercial property and property zoned for lower intensity residential use. But, as noted, Crabtree also admitted, without equivocation, that the R–7 zoning on plaintiffs' property could be changed to commercial zoning, other than C–3 without damaging the public interest; and he also admitted that maintenance of R–7 zoning on plaintiffs' property was not essential to an effective buffer between residential and commercial property. The County also relies on *Tealin Co. v. City of Ladue, supra,* to justify their refusal to rezone. However, in *Tealin,* the legislative body consistently maintained residential zoning on the only side of the thoroughfare over which it had control. Here, however, property on both sides of Olive and east of plaintiffs' parcel is zoned commercial, and property on the opposite side of Olive and to the west is also zoned commercial. Moreover, the nearby parcels fronting on Woods Mill are likewise zoned commercial. This pattern is obviously commercial, and the R–7 residential zoning on plaintiffs' parcel is not congruent with nor does it fit comfortably within this commercial zoning pattern.

■ Another factor to be considered is the effect which removal of the R–7 zoning would have on other property in the area. *E. g. Ewing v. City of Springfield, supra* at 689. Defendant's evidence indicated and the trial court found that commercial development on plaintiffs' property would have a detrimental effect on the value of Forum West Condominiums and on the enjoyment of their recreational facilities. This detrimental effect was based upon the possible creation of an unappealing view and as a possible increase in noise resulting primarily from the building of a fast food restaurant. The possible effect was thus localized to the immediate adjacent property owners. Regardless of the weight commanded by this kind of evidence, a refusal to rezone based primarily upon a desire to benefit or refrain from injuring a few adjacent property owners is not substantially related to the public interest and cannot be justified on that basis. *Huttig v. City of Richmond Heights, supra* at 842–843.

■ As a final factor, defendant cites control of traffic on Olive as a benefit to the general public derived from maintaining residential zoning. Defendant's evidence was that use of plaintiffs' parcel for a fast food restaurant would generate 1,000 cars per day while use of the parcel for a 21

unit apartment would generate only 147 trips per day. However, as pointed out by plaintiffs, the fact that a fast food restaurant may generate additional traffic is not relevant to the issue here. The issue is not the propriety of building a fast food restaurant on plaintiffs' property but rather the constitutionality of the zoning on plaintiffs' property as it currently exists. Moreover, it is undisputed that Olive is a heavily traveled thoroughfare, which has recently been widened from 2 lanes to 5 (100 feet) to alleviate previously existing traffic problems. It is incongruous to use existing traffic conditions to limit a property owner to a use which those very traffic conditions have made undesirable. This traffic argues more for rezoning plaintiffs' property from residential to commercial than against it. This incongruity was emphasized in *Huttig v. City of Richmond Heights, supra* at 840, when the Court stated:

" '. . . any added traffic congestion which would be caused by any ordinary commercial use of this tract would be wholly insignificant, when compared to the existing volume of traffic and congestion; we note also that the correction really needed . . . involves matters of highway engineering and reconstruction, and that it goes much deeper than a mere continuation of the residential zoning of this minor tract; thus the tract should not be penalized because of existing traffic conditions.' Indeed as indicated in *Tews v. Woolhiser*, 352 Ill. 212, 185 N.E. 827, congested traffic conditions '. . . scarcely constitute an argument in support of limitation of block A to residence use, since such conditions rather argue its unfitness for such use'. *Huttig* at 840."

Finally, the facts of the present case are closely parallel and are similar to the facts in the *Huttig* case, *supra*. There the subject tract of land was located on Clayton Road in St. Louis County, a busy thoroughfare like Olive in the present case. There the tract was near a major intersection, Clayton Road and Hanley, comparable to the intersection here, Olive and Woods Mill. There, like the present case, commercial property lined both sides of the thorough-

fare. There, as here, the detriment, if any, from rezoning would be localized to the immediately adjacent property owners. On these essential and basic facts, the Court in *Huttig* concluded the primary benefit of the refusal to rezone the tract from residential to commercial went to a small number of adjacent landowners, and the Court held the refusal to rezone was arbitrary and unreasonable and, therefore, unconstitutional. The only real distinction between *Huttig* and the present case is that, in the present case, the tract of land directly adjacent to the subject parcel to the west and fronting on the thoroughfare is not zoned commercially. However, the residential zoning of this adjacent parcel is not a significant or critical distinction. This property, as noted, is used for the pool and clubhouse for Forum West Condominiums and is designed to be part of a buffer between property zoned for commercial use to the east and property zoned for lower intensity residential use to the west. As also noted, this buffer is adequate without the use of plaintiffs' property.

Having considered the operative factors of this case within the guidelines of our past cases, we must conclude that any public interest served by maintaining the current R–7 on plaintiffs' property is greatly outweighed by the demonstrated detriment to plaintiffs' interest. Maintaining this classification is thus unreasonable and arbitrary and violates plaintiffs' due process rights guaranteed by Art. I, § 10 of the Missouri Constitution and the Fourteenth Amendment of the United States.

Our resolution of this issue makes it unnecessary to reach plaintiffs' contention that the R–7 zoning was an unconstitutional, confiscatory taking of their property. In addition, we do not address plaintiffs' other contention that the County Council's refusal to rezone plaintiffs' property to C–3 was an abuse of discretion. By this latter contention, plaintiffs ask us to focus on a denied classification rather than the current classification and, in effect, seek an order from us to direct the County to rezone their

property to C–3. Although we may address the reasonableness of the current zoning of plaintiffs' parcel, it is not our function to prescribe what commercial use shall be permitted on this parcel. *See Huttig v. City of Richmond Heights, supra; see also Herman Glick Realty v. St. Louis County, supra.* We can only require the County to place a reasonable zoning classification on the property, and, without determining whether plaintiffs have shown that C–3 zoning would be reasonable, plaintiffs certainly have not shown that C–3 zoning is the *only* reasonable zoning of their property.

The judgment of the trial court is reversed with directions to enter a judgment in accordance with this opinion.

SMITH, P. J., and ALDEN A. STOCKARD, Special Judge, concur.