Allan R. HOFFMAN, et al., Respondents,

v.

CITY OF TOWN AND COUNTRY, Appellant.

No. 59436.

Missouri Court of Appeals, Eastern District, Division Four.

April 28, 1992.

Robert B. Hoemeke, Robert J. Will, St. Louis, for appellant.

Peter W. Herzog, Jr., Michael Angelo Vitale, St. Louis, for respondents.

SATZ, Judge.

This is a declaratory judgment action in which plaintiffs, partners in Centre Park Forty Associates (CP40), challenge the reasonableness of the residential zoning of their property located on the north outer road of Highway 40, in the defendant city, Town and Country. The trial court found the residential zoning to be unconstitutionally unreasonable. Town and Country appeals. We affirm.

## Scope of Review

At the outset, the parties disagree about the scope of our review. Town and Country argues that we must review *de novo* the evidence adduced at trial, and, in turn, it also contends that our review is not restricted by the standards of appellate review established in *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). CP40 contends that challenges to the validity of zoning ordinances are to be reviewed *de novo*, but, in doing so, the appellate court must defer to the findings of the trial court in factual issues, "especially those that were made with respect to conflicting testimony."

This disagreement stems, in part, from the review process itself and from the language used by our courts explaining that process. Both parties are partially correct.

In Missouri, zoning, rezoning and refusals to rezone are considered to be legislative acts, not quasi-judicial acts. *E.g., Erigan Company, Inc. v. Town of Grantwood Village,* 632 S.W.2d 495, 496 (Mo.App.1982). The review of the local legislative body's grant or denial of rezoning is not initiated in a trial court by direct appeal on the record made before the legislative body, rather review is initiated by a plenary action, such as the request for a declaratory judgment to declare the grant or denial of rezoning to be a deprivation of

rights. *See, e.g. Vatterott v. City of Florissant*, 462 S.W.2d 711, 713 (Mo.1971). The trial court is, thus, not confined to nor concerned with the record made before the legislative body.

■ However, the challenger to the legislative body's grant or denial of rezoning does not begin the plenary action unburdened. The grant or denial is presumed to be valid, with the burden placed upon the challenger to overcome that presumption. *Id.* In conjunction with and, perhaps, in amplification of that presumption, it is said that the decision of the legislative body to grant or deny rezoning, being a legislative act, will be upheld if the decision is "fairly debatable". *E.g., Elam v. City of St. Ann*, 784 S.W.2d 330, 335 (Mo.App. 1990); *see Binger v. City of Independence*, 588 S.W.2d 481, 486 (Mo. banc 1979) (annexation). In short, the trial court, in a plenary action, reviews a presumptively valid decision of the local legislative body to determine whether the decision was fairly debatable, on a record which may, and probably quite often does, differ from the record before the legislative body.

Normally, in this review process many of the operative, relevant facts are not in dispute, such as the topography of the land in question, the development of adjacent and nearby property and the history of that development. The dispute is usually between the opinions of the parties' respective experts—one or more experts testifying the property is properly zoned, their counterparts testifying it is not. If the experts disagree on the operative facts underpinning their respective opinions, the trial court must credit one or the other. The facts discredited, in turn, discredit the opinion based upon them, and the facts credited, in turn, credit the opinion based upon them. If the trial court engages in this type of credibility determination, Rule 73.-01(c) and the mandate of *Murphy v. Carron* require us as an appellate court to defer to the trial court's determination. *See, e.g. National Super Markets, Inc. v. City of Bellefontaine Neighbors*, 825 S.W.2d 24, 26–27 (E.D.Mo.App.1992).

But, quite often, the parties' respective experts reach their individual opinions by using different sets of operative facts, and no expert disputes the facts used by an opposing expert. The credibility of the experts then "occupies a very narrow field; the questions are rather those of judgment, and the logic (or lack of it) in expert opinions." *Huttig v. City of Richmond Heights*, 372 S.W.2d 833, 839 (Mo.1963); *Loomstein v. St. Louis County*, 609 S.W.2d 443, 447, n. 3 (Mo.App.1980).

■ Regardless of the determinations made by the trial court to reach its decision that the local legislative body's grant or denial of rezoning was or was not fairly debatable, however, we, in reviewing the trial court's decision, make our own independent determination of whether the legislative body's decision was fairly debatable. *Elam supra; Binger, supra.* Thus, we said in *Elam*, perhaps inartfully, that "we review *de novo* " any challenges to the acts of the legislative body. *Elam, supra*, 784 S.W.2d at 335. However, to the extent the trial court has discredited an expert's opinion by discrediting the operative facts upon which that opinion is based, we are bound to defer to that determination in making our own independent determination of whether the legislative body's grant or denial of rezoning was fairly debatable. *National Super Markets, Inc., supra.*

In the present case, the trial court adopted the report of the special master in which extensive findings of fact were made to support the conclusion that Town and Country's refusal to rezone was unreasonable. The court, however, did not expressly discredit the facts upon which Town and Country's experts based their opinions that the refusal to rezone was reasonable. More important, we cannot sensibly find the court so discredited those experts by implication. We cannot do so primarily because the court's findings of fact are facts apparently inferred from the opinions of CP40's experts and those opinions differ from the opinions of Town and Country's experts because, for the most part, they are based upon different sets of operative facts. Thus, we do not find that the trial

court necessarily discredited Town and Country's experts. However, we have read the 850 pages of transcript and read and viewed the 75 exhibits, and, independent of the trial court's findings, we have reached the same conclusion it did: Town and Country's refusal to rezone is unconstitutionally unreasonable and that issue is not fairly debatable.

CP40 pleaded its challenge to the existing zoning in two counts: Count I—a request to declare the zoning unconstitutional and to enjoin Town and Country from enforcing it; and Count II, a request for damages for an unconstitutional taking of its property. Summary judgment was entered in Town and Country's favor on Count II, and Count I was referred to a special master for hearing. After the hearing, the master found in favor of CP40 on Count I. The trial court adopted the master's findings and entered judgment in favor of CP40.

On appeal, Town and Country argues that the issue of "constitutional due process" was never pleaded nor tried. We disagree. Although, perhaps, not artfully pleaded in lucid and pristine isolation, CP40 did plead, in Count I, that the existing zoning was "unlawful, arbitrary [and] unreasonable" in violation of the "Fourteenth" [Amendment] to the United States Constitution.

■ Town and Country also argues that the summary judgment in its favor on Count II effectively prohibited a hearing on the constitutional issues raised in Count I under the doctrines of "res judicata, collateral estoppel and law of the case." Although we disagree on the merits of this broad based attack, we do not address it. Town and Country makes this argument as a bald statement in its brief with reference to that part of the legal file containing similar arguments made by it at trial. Since the argument was not developed in the brief, with appropriate case law support, we deem this argument abandoned. Rule 84.04(d); *e.g., Steenrod v. Klipsch Hauling Co., Inc.,* 789 S.W.2d 158, 166 (Mo.App.1990); *Boswell v. Steel Haulers, Inc.,* 670 S.W.2d 906, 912 (Mo.App.1984).

### *Location of Property*

The property in question is shown in the following schematic sketch not drawn to scale.

CP40's 13.6 acre tract of land is located approximately midway between Mason Road on the west and Interstate 270 on the east, abutting the north outer road along Highway 40. The property's northern boundary line is the city limit of Town and Country. The property is zoned suburban low which permits single family residences, churches, schools, parks, orchards and farms, and not for profit outdoor recreational areas.

Immediately west of the property is the Citicorp office complex and parking lot, which is zoned office. Continuing west to Mason Road, the land is zoned for office use, and office complexes are built on that land.

The Priory of St. Mary owns land immediately to the northwest of CP40's property. The Priory's land is not located in Town and Country, and the part adjacent to CP40's property is undeveloped. To the north and directly adjacent to CP40's property is a 18.52 acre tract of undeveloped land also owned by CP40, located in Creve Coeur and zoned one acre residential. To the northeast is an undeveloped tract of land owned by Missouri Baptist College, not located in Town and Country.

To the east and directly adjacent to CP40's property is an undeveloped 15.88 acre tract of land owned by the Church of Jesus Christ of Latter–Day Saints, located in Town and Country and zoned suburban low. Continuing east to Highway 270, the land is zoned suburban low, with three or four homes on it and the rest undeveloped.

Across Highway 40, on the south side, between Mason Road on the west and Interstate 270 on the east, the land is in Town and Country and is zoned major educational and suburban estate. Directly west of Interstate 270, the land has been residentially developed. Continuing west from this residential development to Mason Road, the land is owned by the Principia School.

West of Mason Road, on the north side of Highway 40, the land is still in Town and Country and is zoned suburban estate. Troop C of the Missouri State Highway Patrol has its headquarters at the junction of Mason Road and Highway 40. Continuing west to the city limits of Town and Country, the land is first zoned suburban low and so developed, and then zoned office and major educational and so developed.

Immediately west of Mason Road on the south side of Highway 40, the land is in Town and Country, zoned and developed suburban estate. The land directly adjacent to Highway 40 is used for institutional purposes. Continuing west to the city limits, the land directly adjacent to Highway 40 is zoned office and commercial and so developed.

## Procedural History

The 13.6 acre tract of land in issue is part of a larger 32.12 acre tract of land owned by CP40. In July, 1983, Woodson Holding Co., apparently a straw party for CP40, contracted to buy the 32.12 acres, contingent on that tract being rezoned. At that time, the 13.6 acre tract of land was within the zoning jurisdiction of St. Louis County, was zoned residential and had been so zoned since 1965. The remaining 18.52 acres, to the north, were located in the City of Creve Coeur and were zoned residential.

In September 1983, the Woodson Holding Co. petitioned St. Louis County to rezone the 13.6 acre tract from residential to office use and petitioned Creve Coeur to rezone the 18.52 acre tract from residential to planned office use. In December 1983, Town and Country annexed the 13.6 acre tract. Subsequently, CP40, acting through Woodson, waived the rezoning contingency in the land contract, Woodson assigned the contract to CP40, and, in June, 1984, CP40 purchased the 32.12 acre tract for $1,900,-000 plus $95,000 in commissions.

Prior to closing the sale, however, CP40 filed petitions for rezoning and a development proposal with the Town and Country Planning and Zoning Commission. In January 1987, before acting on CP40's petition, Town and Country adopted a land use plan, a zoning map, and a new zoning ordinance, which rezoned the property from St. Louis County's residential to its suburban low.

In December 1987, CP40 resubmitted its rezoning petition and Site Development Plan to Town and Country, and, subsequently, it submitted revised Site Plans. After two public hearings in March and April, 1988, the Planning and Zoning Commission recommended denial of CP40's petition to rezone. Then, after a public hearing held in May 1988, the Town and Country Board of Aldermen denied the rezoning petition in June 1988. This action followed.

## Issues

■ As previously discussed, the only issue we need review is whether Town and Country's refusal to rezone was fairly debatable. *Huttig, supra* 372 S.W.2d at 839;

*Elam, supra* 784 S.W.2d at 335. The refusal to rezone is presumptively valid, and CP40 has the burden of overcoming that presumption. *Elam, supra* at 335. The presumption of validity carries with it the presumption that maintaining the zoning is in the public interest and welfare, and, thus, the basic question is whether that public interest and welfare outweighs the detriment to CP40's interests caused by the zoning. *Huttig, supra* 372 S.W.2d at 839; *Loomstein, supra* 609 S.W.2d at 446–447.

CP40 must, in the first instance, establish that the detriment caused it by the existing zoning outweighs the benefit to the general public. *Elam, supra* 784 S.W.2d at 335. Once CP40 satisfies that burden, we then determine whether the evidence of Town and Country makes the continuance of the existing zoning fairly debatable. *Id.* "No one factor is dispositive in balancing public versus private interests. Each case stands on its own facts and circumstances." *Rhein v. City of Frontenac*, 809 S.W.2d 107, 110 (Mo.App. 1991).

### Review of Evidence

To show the detriment caused it by the existing zoning, CP40 showed that residential development on the property was not economically feasible. *E.g., Loomstein, supra* 609 S.W.2d at 447, 449. CP40's expert, Mr. Richard Ward, a consultant for city planning and real estate development, prepared several residential site plans for the property and chose what he believed to be the most feasible. The following. is a schematic sketch of the site plan not drawn to scale.

CP40 HOMESITE PLAN

COMMON GROUND

The site plan consists of eight one acre homesite lots; three lots are located on a cul-de-sac on the west side of the property, and the remaining five lots are located aside a winding road on the east side. In the area between the five lots on the east, and the Highway 40 north outer road there is a water retention pond; the remaining acreage is woodlands.

In preparing the site plan, Mr. Ward considered several factors, including the suburban low zoning, which allowed one acre lots and some "clustering" of homes,[1]

1. All experts agreed that suburban low zoning permits some clustering of homes. We accept their testimony, although we were unable to

the topography of the land, the trees that must be retained on the land, and the power lines on the west boundary line of the property. The plan was accepted by another expert for CP40 as a realistic and acceptable plan.

To determine whether residential development is economically feasible, CP40 established that, in this area, the selling price of a home must be four to five times the cost of a developed lot. All experts agreed to this ratio. The cost of the developed lot is the sum of the cost to acquire the undeveloped lot plus the cost to develop the lot for building, which includes grading, protection against storm water, utilities and roads.

Mr. Ray Steege, an engineer who reviews and designs subdivisions and development costs for developers, determined the development cost for the eight lots on CP40's site plan would be $88,160 per lot. This cost was accepted and relied on by CP40's other experts.

The actual cost of the undeveloped land to CP40 was approximately $62,000 per acre, or $843,200 for the entire 13.6 acres.[2] Mr. Ward's site plan has eight home site lots; therefore, the cost of each undeveloped lot is $105,400 ($843,200/8); and the cost of each developed lot is $193,560 ($105,400 + $88,160). To be economically feasible, homes must sell for 4 to 5 times this amount, or $772,240 to $967,800 per home.

CP40 established that homes on the CP40 property would only sell for $350,000 to $450,000, at best. Mr. Ward said the close proximity of Highway 40 had a detrimental effect on the selling price of the homes. The vista of Highway 40 and the traffic noise from the highway, Mr. Ward said, were factors which made residential use of the property "totally inappropriate". He said homes on the cul-de-sac in his site plan would be the most significantly impacted

by the highway, and would sell for only $350,000 to $450,000.

Two other experts in real estate testified that the homes on the property would only sell for $300,000 to $350,000 because of the close proximity of Highway 40 and the high tension power lines on the property's west boundary line. In addition, Mr. Ward testified that he did not know of any homes within 500–600 feet of the highway in this corridor along Highway 40 which have sold for $800,000.

In addition to showing that residential development of the property was not economically feasible, CP40 established that the property was not desirable for residential development. *E.g., Rhein, supra* 809 S.W.2d at 110. Homes in close proximity to highways are in less demand than those which are not, because of highway noise and traffic. Two real estate developers testified that their companies would not be interested in developing the CP40 property as residential because of the close proximity of Highway 40.

Noise and sound studies were performed on the property by Mr. Jason Weissenburger, an engineer consultant in noise and traffic. He used the noise level standards for residential development established by the Federal Highway Administration and the Department of Housing and Urban Development for each agency's use. Although these standards do not prohibit residential development, he determined that only the back one-fourth to one-third of the property would meet the Highway Administration's standards and only the back one-half to two-thirds of the property would meet the Housing Department's standards.

In addition, the power lines on the west boundary of the property, the location of the property adjacent to office buildings, the non-residential land use pattern in this area of Highway 40, and the major site development costs due to the flood plain, drainage problem, and berming to provide

find express permission in the zoning ordinance.

2. CP40 purchased the entire 32.12 acre tract for $1,995,000. This cost includes commission. At trial, CP40's experts determined the cost of the

undeveloped land by using a current appraised value of $1,000,000 for the acreage in Town and Country. We have chosen to use the actual cost of the land to CP40.

noise protection were factors which contributed further to the undesirability of the property for residential use.

CP40 also established a marked disparity between the value of the property as zoned and if zoned for office use. *E.g., Rhein, supra* 809 S.W.2d at 110. A commercial real estate appraiser, using comparable sales, appraised the property as zoned at $1,000,000, and if zoned for office use at $4,650,000.

■ Town and Country argues that CP40 failed to show a private detriment because CP40 did not show that the market value of the property has decreased under its current zoning. Such a decrease is a "necessary condition", it contends, to establishing private detriment. It cites *Tealin Co. v. City of Ladue,* 541 S.W.2d 544, 549 (Mo. banc 1976); *White v. City of Brentwood,* 799 S.W.2d 890, 893–894 (Mo. App.1990); *Elam, supra* 784 S.W.2d at 336–337; *Gerchen v. City of Ladue,* 784 S.W.2d 232, 235 (Mo.App.1989).

Town and Country reads too much into these cases. The effect of the current zoning on property value is a factor which may tend to show private detriment. *Elam, supra* 784 S.W.2d at 335. But, the statement in *Elam* that "there can *arguably* be no private detriment in the absence of a demonstrated *negative* impact on property value", *Id.* at 336, (emphasis added), is characterized simply as an argument. It was not relied upon by us in *Elam,* nor has it limited us in our subsequent decisions. *See, e.g. Rhein, supra* 809 S.W.2d at 110; *White, supra* 799 S.W.2d at 893–894. Thus, one relevant factor in showing private detriment may be the difference in the value of the property as zoned and as desired to be zoned. *E.g. Rhein, supra; White, supra.*

■ Here, CP40 has shown a detriment to its private interests by showing that residential development is not economically feasible, the undesirability of use of the property as zoned, and a marked disparity in value between the property as zoned and if zoned for office.

CP40 has also shown "that the current zoning cannot be justified as serving a public interest which outweighs the detriment to [CP40's] private interest." *Loomstein, supra* 609 S.W.2d at 450. "Factors relevant to the determination of a public benefit include the character of the neighborhood, the zoning and uses of nearby property and the effect that a change in zoning would have on other property in the area." *White, supra* 799 S.W.2d at 894. As described in detail previously, the CP40 property is surrounded primarily by office development and institutional uses on the north side of Highway 40. The zoning and uses surrounding the CP40 property on the north of Highway 40 are office development on the west and a 15 acre area to the east, zoned suburban low, which will be used for church purposes. CP40 presented evidence that institutional use of property is comparable, and sometimes even more intense than, office use because of the height and size of the building and the traffic generated.

To be sure, there are residential uses of property in Town and Country located on the south side of Highway 40. However, the CP40 tract is separated from the residential development south of Highway 40 by the eight or more lanes of Highway 40 and the four lanes of outer road. There is no direct access between the residential area south of Highway 40 and the CP40 property. To get from one area to the other a car must drive along the north outer road to Mason Road or Interstate 270, and then circle back on the south outer road.

CP40 also showed that a change in zoning would not have a negative effect on other property in the area. CP40 presented evidence that the residential landowners to the east of the Church of Jesus Christ of Latter–Day Saints property, and on the north side of Highway 40, had no objections to the change in zoning, and in fact petitioned for the area north of Highway 40 from Interstate 270 to Mason Road to be zoned something other than single family residential. CP40 also presented evidence that the existing roadways could accommo-

date additional traffic from an office development on the CP40 property.

Town and Country points out that CP40 bought the property when it was zoned residential by St. Louis County, and, therefore, it contends CP40 cannot sensibly argue that Town and Country's continuing this residential zoning frustrates a legitimate investment backed expectation. *See, e.g. White, supra* 799 S.W.2d at 894. However, in 1983, prior to Town and Country's annexation of the 13.6 acres, Mr. Gary Crabtree was a "land supervisor" in St. Louis County Department of Planning. At that time, he told a representative of CP40 that the Department "could support" an office development on the original 32.12 acre tract. With this fact known to CP40, we cannot say it was an irrational gamble to purchase the property prior to annexation for office development.

By this record, CP40 has overcome the presumptive validity of Town and Country's denial of rezoning. Town and Country's evidence did not show that the reasonableness of the existing zoning was fairly debatable.

Town and Country introduced its own site plan and development costs. Mr. Lane Kendig, a city and regional planner who regularly develops site plans for commercial and residential developers, developed a residential plan for the CP40 property. The following is a schematic sketch of that plan not drawn to scale.

TOWN AND COUNTRY
HOMESITE PLAN

COMMON GROUND

PROPOSED DETENTION AREA

This plan differs from the CP40 site plan. It has eleven homesites; three homes surround a cul-de-sac on the west side of the property, and eight homes sit aside a road on the east side of the property. In addition, the lots are one-half acre lots,[3] for which, Mr. Kendig says, a conditional use would be required.

Mr. Thomas Herrmann, an engineer and land supervisor, prepared the development costs for Town and Country's plan. He determined the development cost per lot to be $33,728.

In developing the site plan and determining the accompanying development costs, Town and Country's experts took into account the same basic factors which CP40's experts did: the topography of the land, specifically the floodplain and storm water detention, and the existing trees, the location of the office use to the west, the power lines located on the west, and the effects of the close proximity of Highway 40. Town and Country, however, failed to show there was an available market for homes on one-half acre lots in this area at the price for which each home must sell.

Mr. Kendig, understandably, agreed that the price a home will sell for determines whether or not a site plan is economically feasible. Town and Country's evidence was that the sale price would be about $441,500 to $550,900. The cost of the 13.6 acres was $843,200 which translates into $76,650 per lot for each of the eleven homesite lots. The development cost per lot, according to Mr. Herrmann, would be $33,728. Thus, the cost of a developed lot would be $110,378. The selling price must be 4 to 5 times this figure, which is $441,512 to $551,890. However, there was no testimony that the homes could potentially sell for this price.

There is a reference in the evidence to The Hamptons, a residential development located on the south side of Highway 40 between Mason Road and Woodsmill Road. There is no indication in the record, how-ever, of the distance between The Hamptons and CP40's property.

At least one of CP40's witnesses referred to the homes in The Hamptons as being in the $700,000 to $800,000 range. But, this and other references cannot be construed as admissions by CP40 that the homes built or to be built at The Hamptons are marketable at those prices or are comparable to the homes which can be built on CP40's property. CP40's witnesses testified to the contrary. Thus these witnesses noted that The Hamptons' site is located on the south side of Highway 40, the approach to The Hamptons is "much nicer" since it does not require driving by commercial buildings, the property is "deeper", allowing for more houses on the back of the property, and the site is next to Fairfield, a "very high luxury" condominium project. In addition, the two lots in The Hamptons closest to Highway 40 have not yet been developed and sold.

Moreover, Town and Country's evidence, particularly that of Mr. Kendig, does not show The Hamptons residential development would be comparable to a residential development located on CP40's property. Mr. Kendig presented a picture of a model house in The Hamptons and located the model house on the map. Mr. Kendig indicated this house was located 400 to 500 feet south into the property. He did not testify, however, how or why The Hamptons, or the model house, would be comparable to the residences on CP40's property.

Town and Country contends that The Hamptons is comparable to the CP40 property because The Hamptons was used as a comparable property in CP40's appraisal of the fair market value of CP40's property. The appraisal referred to was conducted by Thomas Mader for CP40. Mr. Mader was hired by CP40 to appraise the current fair market value of the undeveloped 13.6 acre tract of land. One of the appraisal methods he used was the market data approach, using comparable land sales. He used the

---

**3.** It is not clear from the record whether all eleven homesites are one-half acre lots or only the eight which are clustered.

sale of The Hamptons property as a comparable sale of a large undeveloped tract of land with residential zoning. Thus, he was comparing the sales of large tracts of undeveloped land, not the sale of homes which had been built on that land, nor the market prices for the homes which could be built on the land.

Furthermore, the homes on Town and Country's plan are not comparable to those on CP40's plan, so we cannot find that the estimated selling prices for homes on CP40's plan are applicable to the homes on Town and Country's plan. For example, at least eight of the homes on Town and Country's plan are on one-half acre lots, in a uniform cluster arrangement, while the homes on CP40's plan are on one acre lots set out in a more spacious arrangement.

Mr. Herrmann, one of Town and Country's experts, did compute a lower development cost for CP40's site plan than CP40 did. However, we used his development cost to compute the required sales price of the homes on CP40's plan and find that price to range from $606,000 to $757,500 per home.[4] There was no evidence the homes were marketable at those prices.

CP40 did appraise the value of its tract at $1,000,000 as currently zoned, and Town and Country appraised the tract at $1,585,-000 as currently zoned. Because of this market value of the tract as currently zoned, Town and Country argues that development under the current zoning must be economically feasible. However, the flaw in this reasoning is that the market considers all factors, not the least of which is the possibility the zoning will be changed.

Town and Country also argues that a market demand for CP40's tract as zoned is shown by the fact that the tract of land immediately east was sold "in June, 1990" at "$146,000 per acre" for church purposes. This use is permitted by suburban low zoning, but this sale for institutional purposes stands alone in this area within the recent past. That hardly shows a market demand.

Moreover, two of the partners in CP40, Mr. Daniel Devereux and Mr. Sidney Stone, discussed the possible sale of the tract with a number of residential and commercial developers, and only the latter group showed any interest in purchasing the tract.

Finally, the only evidence relevant to public benefit was the testimony by a present member of the Town and Country Board of Aldermen and the Planning and Zoning Commission that the road system would be overburdened because the neighboring property owners would then petition for rezoning. However, there was no evidence to substantiate this claim. Traffic studies were not conducted by Town and Country nor by Mr. Kendig.

Mr. Kendig did testify that a change in zoning would effect a surrounding use because the residents in Town and Country on the south side of Highway 40 would be looking across the highway at an office development, not a residential development. It is questionable whether residences separated from CP40's tract by eight lanes of highway and four lanes of outer roads constitute a "surrounding use." However, even if considered as a surrounding use, "neighboring property owners are not the 'public' and their collective interests are not the 'public interest' which must be weighed in any rezoning inquiry." *Rhein, supra* 809 S.W.2d at 111.

The reasonableness of the suburban low zoning of CP40's property is not fairly debatable. The trial court's judgment is affirmed.

SMITH, P.J., and CARL R. GAERTNER, C.J., concur.

4. Mr. Herrmann's development cost was $368,-890, or $46,100 per lot. Added to the cost of the land, $105,400 per lot, the total cost of each developed lot would be $151,500, requiring a selling price of $606,000 to $757,500 per home.