IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 17, 2011 Session

# CONOLY BROWN, ET AL. v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE

Circuit Court for Davidson County
No. 10C2390    Amanda Jane McClendon, Judge

No. M2011-01194-COA-R3-CV - Filed June 21, 2013

The Metropolitan Council adopted a series of three ordinances that (1) created a new zoning classification called Specific Planning (SP); (2) rezoned over 700 parcels of property to SP zoning; and (3) amended permitted uses in SP zones to exclude certain types of financial services, specifically check cashing services not part of a bank.  The plaintiffs owned property on which that type of service was conducted and another parcel on which they intended to conduct the excluded services.  Their parcels were among those rezoned as SP. We reverse the trial court's holding that the plaintiffs' challenge should have been brought as a common law writ of certiorari action because the act of rezoning by amending the zoning ordinance is a legislative act which is reviewable in a declaratory judgment action.  We also hold that the ordinance rezoning the 700 parcels was invalid because it was not consistent with the enabling ordinance creating the SP classification.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Reversed and Remanded**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR. and RICHARD H. DINKINS, JJ., joined.

Peter H. Curry, Nashville, Tennessee, for the Appellants, Conoly Brown, David Hood, and Tennessee Quick Cash, Inc.

Kathryn S. Evans, Cynthia E. Gross, and Jason P. Bobo, Nashville, Tennessee, for the Appellee, the Metropolitan Government of Nashville and Davidson County, Tennessee.

## OPINION

## I. BACKGROUND

The plaintiffs in this case are Conoly Brown, David Hood, and Tennessee Quick Cash, Inc. ("TQC") (collectively, "Landowners"). Messrs. Brown and Hood own the property located at 3100 Gallatin Pike, Nashville Tennessee (the "Property"). Messrs. Brown and Hood are the sole shareholders of TQC, a Tennessee corporation which operates a financial services business on the Property that provides a range of services for its customers including check cashing, consumer loans, electronic payment of bills, telephone payment plans, and check advances, among others. Messrs. Brown and Hood also own property located at 934 Gallatin Road which they purchased in 2007 for the purpose of opening another financial services business providing, *inter alia*, check cashing, cash advances, and title loans services.

Through a series of actions by the county legislative body, the Metropolitan Council, the properties owned by the Landowners have been rezoned in a way that prohibits use of the properties to provide the types of financial services they have provided and intend to provide. This result was accomplished through several pieces of legislation, each of which is briefly described below.

### A. Creation of New Zoning Classification

In 2005 the Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro") created a new zoning classification known as "Specific Planning" ("SP zoning"). The classification was created through the Metro Council's adoption of Ordinance No. BL2005-762, now codified as Section 17.40.105 [Specific Plan – Purpose and intent] and Section 17.40.106 [Development plan]. Section 17.40.105 sets forth the purpose and intent of the SP zoning:

> The specific plan (SP) district is an alternative zoning process that may permit any land uses, mixture of land uses, and alternative design standards, as may be required to address the unique characteristics of an individual property through a site specific plan. In return, a SP district requires the site specific plan to be designed such that, at a minimum, the location, integration and arrangement of land uses, buildings, structures, utilities, access, transit, parking, and streets collectively avoid monotony, promote variety, and yield a context sensitive development. The site specific plan must comply with the building, fire and life safety codes adopted by the Metropolitan Government.

**B. Rezoning of Gallatin Pike Corridor to SP Zoning**

On July 23, 2007, the Metro Council approved Ordinance No. BL2007-1523, the stated purpose of which was to "chang[e] various zoning districts to SP zoning, various properties located along Main Street and Gallatin Pike (263.71acres), to regulate land uses and establish sign and development standards . . . ." The specific plan adopted by this ordinance was titled The Gallatin Pike Improvement District Specific Plan (the "GPIDSP").

This plan rezoned 766 parcels of land located along the Main Street and Gallatin Pike corridor, running from South Fifth Street in East Nashville north to Briley Parkway in Madison. Prior to the enactment of this ordinance these 766 properties had various zoning classifications; for example, some properties were zoned for residential use and some were zoned for commercial use. As a result of Ordinance BL2007-1523, all 766 properties were rezoned as SP zoning. Both the Landowners' properties are located within this corridor and are subject to this ordinance.

The GPIDSP contained a section entitled "Excluded Uses," and among the thirty-one uses that were specifically excluded from the Main Street and Gallatin Pike Corridor Plan is "Title loan."

**C. Addition of Excluded Uses in SP Zoned Property**

On October 14, 2008, the Metro Council approved Ordinance No. BL2008-169, which added five new use definitions to the zoning regulations: "financial institution," "check cashing," "pawnshop," "title loan," and "cash advance." "Financial institution" was defined as "an establishment [that] provides a variety of financial services, including generally, banks, credit unions, and mortgage companies." "Check cashing," "title loan," "pawnshop," and "cash advance" were all defined "as regulated by Title 45 . . . of the Tennessee Code Annotated."

Check cashiers are licensed under Title 45, Chapter 18; title loan lenders are licensed pursuant to Title 45, Chapter 15, and cash advance lenders are governed by Title 45, Chapter 17. The Landowners contend that the only reason for adopting these new definitions was to distinguish between mainline banks that cashed checks for a fee, made short term cash consumer loans, and made automobile loans secured by the vehicle's title, from the other businesses providing the same services, like TQC, so that these latter businesses could be prohibited in the GPIDSP.[1]

---

[1]The drafters of the GPIDSP apparently intended to exclude title loans, check cashing, and cash

(continued...)

As stated earlier, the result of these ordinances was to prohibit businesses, other than banks, which make title loans, cash checks, and make cash advances, as defined by ordinance, from being located in the Gallatin Pike Corridor, including the two properties owned by Landowners.

## II. PROCEEDINGS IN TRIAL COURT

Landowners filed a petition for declaratory judgment in the circuit court of Davidson County, in which they challenged the legitimacy of Ordinance Nos. BL2005-762, BL2007-1523, and Substitute BL2008-198.[2] They sought a declaration (1) that Ordinance No. 2007-1523, establishing the GPIDSP, be declared null and void because it purported to enact zoning amendments that go beyond the changes envisioned, described, and authorized by the ordinance creating the SP Zoning classification and was adopted in violation of the requirements of that ordinance; (2) that Ordinance No. BL2008-169, purporting to define a difference between a financial institution and check-cashiers, cash advance, and title loan companies, be declared null and void; and (3) that the portion of the GPIDSP Plan prohibiting the uses Landowners engage in, including making title loans, cash advances, and check cashing, be declared null and void because the ordinances that restrict their rights to use their property lack any reasonable or rational basis, thereby violating their constitutional rights to due process and equal protection of the law.

Upon motion by the Metropolitan Government, the trial court dismissed the petition in its entirety. In its Memorandum Opinion granting the dismissal, the trial court addressed each of the arguments raised by Landowners. The court held that the Landowners were

_____

[1](...continued)
advances from the acceptable uses in the area covered by the GPIDSP, but only included "title loans" in the list of excluded uses. This oversight was later corrected when the Metro Council amended the GPIDSP to include "check cashing" and "cash advances" as excluded uses in the area through Substitute Ordinance BL-198 and BL2007-1523. According to Landowners, the "new plan" referenced in Substitute Ordinance No. BL2008-198 did not include the prohibitions of check cashing, pawn shops, and cash advance uses as it was meant to do. This led to an amended Substitute Ordinance No. BL2008-198 to fix the error of the earlier substitute ordinance.

[2] One contention made by Landowners was that the adoption of Ordinance No. BL2005-762 (creating SP zoning classification) was *ultra vires* and, therefore, void or voidable because the Metro Council lacked the requisite delegated authority to adopt SP zoning districts. In reliance on Tenn. Code Ann. §§ 13-7-201(a) [Grant of power], 13-7-103 [Purposes of zoning regulations], 13-4-310 [Power of municipal planning commission to promulgate provisions for development], and 13-3-413 [Power of regional planning commission to promulgate provisions for development], the trial court held the enactment of BL2005-762 was "a valid exercise of power and purpose by Metro." Landowners do not challenge this holding on appeal.

required to challenge Ordinances No. BL2007-1523 and BL2008-198 by writ of certiorari, rather than by a petition for declaratory judgment, and that the time had passed for the filing of a petition for writ of certiorari. The court acknowledged that the resolution of this issue required it to determine whether Metro Council had engaged in an administrative or a legislative function when it adopted Ordinance No. BL2007-1523. The trial court determined the adoption of BL2007-1523 and BL2008-198 were "administrative decisions because Metro applied previously established criteria set forth in Ordinance 2005-762 (codified at Metropolitan Code §17.40.105 et seq.)."

Finally, the trial court addressed the challenge to Ordinance No. BL2008-169, which defined some of the permitted and prohibited uses in the area covered by the GPIDSP. Concluding that the Landlords "cannot show that Metro's ordinance is not reasonably related to a legitimate government interest," the court dismissed this challenge as well.

### III. METHOD FOR CHALLENGING METRO COUNCIL'S REZONING

On appeal, the Landowners challenge the validity of the ordinance applying the SP zoning classification to their properties as part of the rezoning of 766 parcels in the creation of the Gallatin Pike Improvement District Specific Plan. The trial court did not rule on this issue because it found that the Landowners could not bring this claim in a declaratory judgment action but, instead, were required to bring it in an action under the common law writ of certiorari. Therefore, we must first review that decision by the trial court.

> The distinction between the avenues for access to the courts to review local land use decisions was explained by the Tennessee Supreme Court in 1983 in *Fallin v. Knox County Bd. of Com'rs*, [656 S.W.2d 338 (Tenn. 1983)], wherein the Court established the rules to be applied:

>> It is our opinion that an action for declaratory judgment, as provided by T.C.A. §§ 29-14-101 – 29-14-113, rather than a petition for certiorari is the proper remedy to be employed by one who seeks to invalidate an ordinance, resolution or other **legislative** action of county, city or other municipal legislative authority **enacting or amending zoning legislation**.

>> * * *

>> We wish to point out, however, that the remedy of certiorari provided by T.C.A. §§ 27-8-101, 27-9-101--27-9-113 will continue to be the proper remedy for one who seeks to overturn

-5-

> the determination by Board of Zoning Appeals as provided by
> T.C.A. § 13-7-106 *et seq*. and T.C.A. § 13-7-205 *et seq*. This
> distinction in remedies is made because the determinations made
> by a Board of Zoning Appeals are administrative
> determinations, judicial or quasi-judicial in nature, and are
> accompanied by a record of the evidence produced and the
> proceedings had in a particular case, whereas, the enactment of
> ordinances or resolutions, creating or amending zoning
> regulations, is a legislative, rather than an administrative, action
> . . . .

*Moore & Associates, Inc. v. West,* 246 S.W.3d 569, 575 (Tenn. Ct. App. 2005) (quoting *Fallin v. Knox Cnty. Bd. Of Comm'rs*, 656 S.W.2d at 342).

The distinction made by the courts is rooted in the two separate statutory grants of authority to local governments regarding land use. The Tennessee General Assembly has delegated to local governments the authority to regulate use of private property through zoning ordinances. *Lafferty v. City of Winchester*, 46 S.W.3d 752, 757 (Tenn. Ct. App. 2001). The General Assembly has also delegated to local officials the authority to apply and enforce zoning ordinances through the exercise of the police power to protect the health, safety, and welfare of their citizens. *Hoover, Inc. v. Metropolitan Bd. of Zoning Appeals,* 955 S.W.2d 52, 54 (Tenn. Ct. App. 1997).

The basic test for distinguishing between an administrative act and a legislative act is whether the challenged action involves making law or enforcing existing law. *McCallen v. City of Memphis*, 786 S.W.2d 633, 639 (Tenn. 1990) (holding the test for determining whether the governmental action is legislative or administrative is whether it "makes new law or executes one already in existence.")

The Landowners herein argue that Ordinance No. BL2007-1523, on its face and in its application, is a rezoning ordinance that is legislative in nature and, therefore, reviewable by a declaratory judgment action. The summary or purpose paragraph of the ordinance in question provides:

> An ordinance to amend Title 17 of the Metropolitan Code of Laws, the Zoning
> Ordinance of the Metropolitan Government of Nashville and Davidson
> County, by changing from various zoning districts to SP zoning, various
> properties located along Main Street and Gallatin Pike (263.71 acres), to
> regulate land uses and establish sign and development standards, all of which
> is described herein.

The body of the ordinance, in pertinent part, also provides:

Section 1. That Title 17 of the Code of Laws of the Metropolitan Government of Nashville and Davidson County, is hereby amended by changing the Official Zoning Map for Metropolitan Nashville and Davidson County, which is made a part of Title 17 by reference, as follows:

By changing various zoning districts to SP zoning. . . .

Section 2. . . . the Metropolitan Clerk is hereby authorized and directed, upon the enactment and approval of this ordinance, to cause the change to be made on . . . said Official Zoning Map . . . and to make notation thereon of reference to the date of passage and approval of this amendatory ordinance.

This language makes it clear that the Ordinance was a re-zoning ordinance, amended the existing zoning ordinance, and required changes in the official zoning map. Each of these descriptions qualifies the ordinance as a legislative action.

The authority to establish land use limitations, through zoning, is delegated to the local **legislative** body. Tenn. Code Ann. § 13-7-201 (chief legislative body of municipality); Tenn. Code Ann. § 13-7-101 (the county legislative body).[3] Once a zoning ordinance is enacted, any amendment to the ordinance, including the official maps, requires legislative action. Tenn. Code Ann. § 13-7- 204; Tenn. Code Ann. § 13-7- 105 ("The county **legislative** body may, from time to time, amend the number, shape, boundary, area or any regulation of or within any district or districts or any other provision of any zoning ordinance"). State statutes also require that the local legislative body authenticate, compile, update, maintain, and make available to the public the zoning ordinance, map, and all amendments. Tenn. Code Ann. § 13-7- 119; Tenn. Code Ann. § 13-7- 212.

Thus, the authority to enact and amend a zoning ordinance and accompanying map has been delegated exclusively to the local legislative body. Such acts require adoption by the legislative process, including certain statutorily mandated procedures. There exists no

[3]State enabling statutes require that the local planning commission certify a zone plan to the legislative body, which is then required to follow certain procedures before it enacts the plan, which includes text and/or maps. Tenn. Code Ann. § 13-7-104; Tenn. Code Ann. § 13-7-202 ("Whenever the planning commission of the municipality makes and certifies to the chief legislative body a **zoning plan**, including both the full text of a zoning ordinance and the maps, representing . . . .")

authority for an administrative body or officer to enact or amend a zoning ordinance, and such actions are never administrative in nature.

Accordingly, it is universally held that adoption or amendment of a zoning ordinance and amendment of the official zoning map are legislative acts. *See Ball v. Jones*, 132 So.2d 120, 123 (Ala. 1961) (municipal authorities act in legislative capacity in enacting or amending zoning ordinance or rezoning certain area); *Fritz v. City of Kingman*, 957 P.2d 337, 338 (Ariz. 1998) (passage of zoning ordinance is legislative act); *Konigsberg v. Board of Aldermen of City of New Haven*, 930 A.2d 1, 17-18 (Conn. 2007) (amending zoning ordinance and zoning map constitute legislative acts); *Hume v. Franklin Cnty. Fiscal Court*, 276 S.W.3d 748, 752 (Ky. 2008) (decision to rezone and decision to amend zoning map are both legislative functions); *Summerwind Cottage, LLC v. Town of Scarborough*, 61 A.3d 698, 702 (Me. 2013) (drawing of zoning map boundary lines is legislative, not administrative, function); *Richmarr Holly Hills, Inc. v. Am. PCS, L.P.*, 701 A.2d 879, 893 (Md. Ct. Spec. App. 1997) (adopting zoning map is quintessentially legislative function); *City of Monett, Barry Cnty. v. Buchanan*, 411 S.W.2d 108, 113-14 (Mo. 1967) (legislative body is entrusted with sole power to enact comprehensive zoning or rezoning ordinance); *Application of Frank*, 164 S.W.2d 215, 216 (Neb. 1969) (zoning ordinance constitutes exercise of legislative function and city council that adopts rezoning ordinance amending general zoning ordinance acts in legislative capacity); *Munch v. City of Mott, North Dakota*, 311 N.W.2d 17, 22 (N.Dak. 1981) (enactment of zoning ordinance is legislative function); *Schlagheck v. Winterfeld*, 161 N.E.2d 498, 504 (Ohio 1958) (board of township trustees act in legislative capacity when adopting or amending zoning regulation or ordinance); *O'Rourke v. City of Tulsa*, 457 P.2d 782, 784-85 (Okla. 1969) (enacting or amending zoning ordinance is legislative function); *Maynard v. Beck*, 741 A.2d 866, 872 (R.I. 1999) (municipality enacting zoning ordinance is acting in legislative capacity); *City of Pharr v. Tippitt*, 616 S.W.2d 173, 175 (Tex. 1981) (enacting and amending zoning ordinances are exercises of municipality's legislative powers); *Bradley v. Payson City Corp.*, 70 P.3d 47, 51 (Utah 2003) (legislative zoning decisions involve determination and enactment of zoning policies and cannot be delegated to other governmental bodies); *Sampson v. Karnes*, 415 S.E.2d 610, 612 (W.Va. 1992) (enactment of zoning ordinance is legislative function); *Quinn v. Town of Dodgeville*, 364 N.W.2d 149, 157 (Wis. 1985) (because zoning is legislative act, rezoning by amending an ordinance is also legislative in nature).

The Tennessee Supreme Court has similarly recognized the unquestionably legislative nature of such actions. "[**Z**]**oning ordinances and their amendments are clearly legislative acts** and subject to attack by a complaint for declaratory judgment . . . .", *McCallen*, 786

S.W.2d at 639 (citing 8A E. McQuillin, *The Law of Municipal Corporations*, §10.06 at 995 3rd ed. (1986)).[4]

Accordingly, we hold that the enactment of Ordinance No. BL2007-1523, which rezoned 766 parcels and amended the zoning ordinance, was a legislative act and, therefore, subject to judicial scrutiny through an action for declaratory judgment. Therefore, we reverse the trial court's judgment dismissing the action on the basis it was required to be brought as a common law writ of certiorari action.

## IV. VALIDITY OF REZONING ORDINANCE

Landowners assert that Ordinance No. BL2007-1523, which created the GPIDSP and rezoned a large number of parcels, was invalid.[5] The primary reason, they assert, is that it does not comply with the enabling ordinance, *i.e.*, the ordinance that created the new zoning classification, Specific Planning ("SP").

In order to decide this issue, it is necessary to examine the nature of the SP zoning classification. "Zoning is the regulation by the municipality of the use of land within the community, and of the buildings and structures which may be located thereon, in accordance with a general plan and for the purposes set forth in the enabling statute." 1 Rathkopf's The Law of Zoning and Planning § 1:3 (4th ed.). Early zoning ordinances generally created various zones or districts within the local city or county and assigned a specific type of zoning, or a specific zoning classification, to each district. The zoning classification, *inter alia*, limited the types of uses available to land within the district.

---

[4]Metro has argued that this court should apply the test enunciated in some opinions to determine whether a governmental land use decision is administrative or legislative, *i.e.*, "whether the enabling ordinance provides sufficient standards to preclude the exercise of unbridled discretion. In order to qualify as an administrative, judicial, or quasi-judicial act, the discretionary authority of the government body must be exercised within existing standards and guidelines." *McCallen*, 786 S.W.2d at 639. Metro argues that the ordinance establishing the new zoning classification provided sufficient standards and guidelines to allow the Council to determine that the GPIDSP met those standards. Landowners point out that Ordinance No. BL2005-762, the "enabling ordinance," contains no standards or criteria by which to guide the Metro Council in deciding whether to approve the proposed GPIDSP. Rather, section 4 of the ordinance provides that the "Development standards shall be as specifically listed in the site specific SP ordinance." We need not resolve this issue, however, because the test urged by Metro simply does not apply to the enactment or amendment of zoning ordinances, which is clearly a legislative act.

[5]Landowners also argue that the effect of the ordinances, *i.e.*, to eliminate specified uses carried on by their businesses while allowing the same service when performed by a "financial" institution is discriminatory. In other words, they assert that the distinction has no rational basis and, therefore, the enactments should be set aside. Because of our decision herein, we need not address this issue.

The concept of zoning as embodied in early zoning codes was fairly simple and straightforward, as were the codes themselves. The municipality was divided geographically into several different use districts, usually residential, business, and industrial, with a specification of what uses were allowed in these respective districts. The codes then imposed fixed restrictions such as height, bulk, and setback, among others, on the uses allowed in each district. Use districts generally were, and still are, set out on an official zoning map with corresponding allowed uses and restrictions described, as they still are today, in the accompanying zoning code.

*Id.*[6]

More recently, however, local governments have employed other or additional zoning techniques, generally to provide more flexibility and more control. 1 Rathkopf's The Law of Zoning and Planning § 1:14 (4th ed.). In fact, procedures providing flexibility and discretion have become the trend and not the exception.[7] *Id.* Zoning measures have evolved away from Euclidian zoning into a process involving individualized and detailed discretionary review of any significant development application.

Among the techniques that provide flexibility and control of development detail is the "floating zone." *Sheridan v. Planning Bd.*, 266 A.2d 396 (Conn. 1969) (stating that a floating zone "meets the need for flexibility in modern zoning ordinances."); 3 Rathkopf's The Law of Zoning and Planning § 45:1 (4th ed.); 101A C.J.S. Zoning and Land Planning § 41. Metro's SP zoning classification, as described in the ordinance creating it, is a floating zone.

[A] "floating zone" is . . . defined as a two-step zoning technique whereby a municipality first creates a particular use district in its zoning regulation so that the zone is said to "float" over the entire municipality until at some future time, in a second step, the municipality amends its zoning regulations and map to locate, or "settle" the zone on a particular parcel of land. The first step

---

[6]This type of zoning has become known as "Euclidian zoning," because it is the type of zoning that was challenged in *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 387–89, 47 S. Ct. 114, 71 L. Ed. 303 (1926), wherein the United States Supreme Court upheld the constitutionality of zoning.

[7]Procedures in wide use that involve flexibility and individualized review include a floating zone or planned development application, a site plan or design review process, or a special permit or conditional use application. 1 Rathkopf's The Law of Zoning and Planning § 11:4 (4th ed.). The Planned Unit Development (PUD) zoning classification is generally considered a type of floating zone.

makes the floating zone available and the second step places it on the land by a rezoning action, ordinarily at the request of an individual property owner.

80 A.L.R.3d 95 § 1[a]. Another statement describing a floating zone reads:

> A floating zone is a special detailed use district of undetermined location in which the proposed kind, size and form of structures must be preapproved. It is legislatively deemed compatible with the area in which it eventually locates if specified standards are met and the particular application is not unreasonable. A floating zone is a device permitting the establishment of tracts of parcels of land in a specialized use category in accord with the comprehensive plan, without predetermining the exact location by leaving that decision to future needs and demands of a community as they are recognized from time to time. A floating zone is initiated on the instigation of a landowner within the district rather than that of the legislative body. . . . If the zoning body, acting in its legislative capacity, determines that all relevant criteria and conditions have been or can be met, the zone change is approved and the zone floats down upon the designated area to establish physical boundaries.

8 McQuillin Mun. Corp. § 25:100 (3d ed.), *see Sheridan v. Planning Board*, 266 A.2d 396 (Conn. 1969) (using this definition).

Thus, the floating zone procedure establishes a site-specific rezoning and development process with some typical characteristics. It is initially created, or made possible, as a use classification not initially delineated on a zoning map, but one that may later be established on the zoning map by rezoning. Thus, it involves a two-step process wherein the legislative body first creates the classification or special use district with an undetermined location. After the first step, a floating zone exists in the text of the zoning code but not on the zoning map. In the second step the legislative body applies that classification to a specific site or parcel by rezoning that parcel at the request or initiation of the owner. It generally requires a site-specific development plan showing proposed size and form of structures and other development details, a review of the site-specific plan by the planning commission, and approval by the legislative body for rezoning. Sometimes, conditions or restrictions are imposed for the rezoning. If rezoning is approved, a zoning amendment places the floating zone on the specific location or parcel on the zoning map. 1 Rathkopf's The Law of Zoning and Planning § 1:14 (4th ed.); 3 Rathkopf's The Law of Zoning and Planning §§ 38:5, 45:1, 45:2 (4th ed.).

In the case before us, the SP classification was created through the Metro Council's adoption of Ordinance No. BL2005-762, now codified as Section 17.40.105 [Specific Plan – Purpose and intent] and Section 17.40.106 [Development plan]. This ordinance is the enabling legislation for any future action to rezone property to SP. Section 17.40.105 sets forth the purpose and intent of the SP zoning:

> The **specific plan** (SP) district is an alternative zoning process that may permit any land uses, mixture of land uses, and alternative design standards, as may be required to address the **unique characteristics of an individual property through a site specific plan.** In return, a SP district requires the **site specific plan** to be designed such that, at a minimum, the location, integration and arrangement of land uses, buildings, structures, utilities, access, transit, parking, and streets collectively avoid monotony, promote variety, and yield a context sensitive development. The **site specific** plan must comply with the building, fire and life safety codes adopted by the Metropolitan Government.

Section 17.40.106B addresses the application process for applicants seeking SP classification:

> Application Submittal. Following the pre-application conference, an **applicant** may submit a **rezoning application for the SP district** accompanied by a **development plan** in a form and content established by the planning commission, along with a processing fee. At a minimum, the development plan shall consist of written text, exhibits, and plans in a report format that describes existing conditions, **the purpose and intent of the site specific SP**, the plan's consistency with the principles and objectives of the General Plan, a **design plan for the development**, **a list of allowable land uses**, **illustrations of proposed building types, site specific development standards, and a development phasing and construction schedule. . . .**

Further, Section 17.40.106C specifies:

> Adoption of a SP district shall not relieve any property owner from full compliance with the adopted regulations and guidelines of the applicable redevelopment or historic overlay guidelines. Within a SP district, all development shall be consistent with the requirements of the SP district as well as any adopted redevelopment or historical overlay district, whichever is more restrictive.

-12-

Section 17.40.106I addresses the review procedures for an applicant seeking SP zoning:

> Review of a Development Plan. The specific plan district is not intended for speculative development projects, but **represents the applicant's firm intention to develop according to a master development plan in a single development operation, or in a phased series of development operations according to a development schedule submitted in accordance with Section 17.40.106.B.** The planning commission shall review each development plan within a SP district four (4) years from the date on which it was approved by the metropolitan council, and every four (4) years hence until the development plan has been deemed by the planning commission to be complete according to the approved development concept.

This language makes it clear that SP designation is applicable to a **specific site**, requires specific development plans for the specific site, and must be **initiated by an applicant** landowner or person possessing an interest in the land. "The practical effect of a floating zone ordinance usually is to require as a first step that a developer apply to an administrative zoning body for approval of a specific development plan involving a use or uses permitted by the ordinance." 3 Rathkopf's The Law of Zoning and Planning § 45:2 (4th ed.).

Any applicant for SP rezoning must have a "firm intention" at the time of application to develop the site according to plans and schedules approved by Metro. The ordinance requires a high degree of specificity and detail in the proposed development plan for a particular piece or property or development. The ordinance also clearly states that in an SP zone "any land uses, mixture of land uses, and alternative design standards" may be permitted. While the development of an SP-zoned site must comply with any redevelopment or historical overlay district requirements, it is not required to comply with uses available in the zone existing at the time of the placement of the SP rezoning on the zoning map.

A review of Ordinance No. BL2007-1523, which purported to rezone 766 parcels to SP and create the GPIDSP, demonstrates that it does not comply with the ordinance that creates and allows SP zoning. The rezoning ordinance is not directed at a specific site and does not approve a site specific development plan that includes "written text, exhibits, and plans in a report format that describes existing conditions, the purpose and intent of the site specific SP, the plan's consistency with the principles and objectives of the General Plan, a design plan for the development, a list of allowable land uses, illustrations of proposed building types, site specific development standards, and a development phasing and construction schedule," as is required by the enabling ordinance.

-13-

Further, the SP rezoning was not initiated by an applicant, but instead was initiated by members of the Council. Consequently, there was no application or development plan that "represents the applicant's firm intention to develop according to a master development plan in a single development operation, or in a phased series of development operations according to a development schedule submitted," as required by the enabling legislation.

Instead, the GPIDSP provides:

Final site plans shall be submitted in the future for any development within the boundary of the SP. Final site plans shall consist of construction plans that fully demonstrate compliance with the SP and shall specifically describe the nature and scope of development to serve as the basis for the issuance of permits by the Codes Department and all other applicable Metro departments.

Prior to applying for a building permit, applicants shall submit to the Planning Department four complete sets of final construction documents, including site plan and landscape plan, for review and approval prior to the issuance of permits.

Applicants are encouraged to work with Planning staff early in the design and development process. Where obvious physical constraints exist on a site within the SP, Metro Planning staff will review alternative design solutions as they relate to the intent of the SP for that subdistrict. . . .

Because Ordinance No. BL2007-1523 does not comply with the ordinance creating and authorizing the use of the Specific Plan zoning classification, the attempted rezoning of 766 parcels was invalid. Ordinance No. BL2007-1523 was not effective to accomplish the rezoning to SP.

Costs on appeal are taxed to the Appellee, the Metropolitan Government of Nashville and Davidson County, and the case is remanded to the Circuit Court of Davidson County for any further proceedings that may be necessary.

_____
PATRICIA J. COTTRELL, JUDGE

-14-